[No. S155094. Jan. 5, 2009.]

EPISCOPAL CHURCH CASES.

470

## COUNSEL

Holme Roberts & Owen, John R. Shiner, Brent E. Rychener; Horvitz & Levy, Frederic D. Cohen and Jeremy B. Rosen for Plaintiffs and Appellants Jane Hyde Rasmussen, The Right Rev. Robert M. Anderson, The Protestant Episcopal Church in the Diocese of Los Angeles and The Right Rev. J. Jon Bruno, Bishop Diocesan of the Episcopal Diocese of Los Angeles.

Law Offices of George S. Burns, George S. Burns, Kathryn M. Schwertfeger and John C. Ashby for the Presbyterian Church (U.S.A.), the Synod of Southern California and Hawaii and the Presbytery of Hanmi as Amici Curiae on behalf of Plaintiffs and Appellants Jane Hyde Rasmussen, The Right Rev. Robert M. Anderson, The Protestant Episcopal Church in the Diocese of Los Angeles and The Right Rev. J. Jon Bruno, Bishop Diocesan of the Episcopal Diocese of Los Angeles.

Goodwin Procter, David Booth Beers, Heather H. Anderson, Jeffrey David Skinner and Matthew J. Wilshire for Intervener and Appellant The Episcopal Church.

Weil, Gotshal & Manges, Christopher J. Cox and Douglas E. Lumish for Clifton Kirkpatrick, Joey Mills, Katherine J. Runyeon, Rev. Joseph Lee, Elder John Lococo, General Council on Finance and Administration of the United Methodist Church, Wesley Granberg-Michaelson, General Conference of the Seventh-day Adventists, Christian and Missionary Alliance, International Church of the Foursquare Gospel and Worldwide Church of God as Amici Curiae on behalf of Intervener and Appellant The Episcopal Church.

Law Offices of Tony J. Tanke and Tony J. Tanke for Holy Apostolic Catholic Assyrian Church of the East as Amicus Curiae on behalf of Intervener and Appellant The Episcopal Church.

Payne & Fears, Eric C. Sohlgren, Benjamin A. Nix, Daniel F. Lula; Greines, Martin, Stein & Richland and Robert A. Olson for Defendants and Respondents Rev. Praveen Bunyan, Rev. Richard A. Menees, Rev. M. Kathleen Adams, The Rector, Wardens and Vestrymen of St. James Parish in Newport Beach, California, James Dale, Barbara Hettinga, Paul Stanley, Cal Trent, John McLaughlin, Penny Reveley, Mike Thompson, Jill Austin, Eric Evans, Frank Daniels, Cobb Grantham and Julia Houten.

Lu T. Nguyen for The Charismatic Episcopal Church as Amicus Curiae on behalf of Defendants and Respondents Rev. Praveen Bunyan, Rev. Richard A. Menees, Rev. M. Kathleen Adams, The Rector, Wardens and Vestrymen of St. James Parish in Newport Beach, California, James Dale, Barbara Hettinga, Paul Stanley, Cal Trent, John McLaughlin, Penny Reveley, Mike Thompson, Jill Austin, Eric Evans, Frank Daniels, Cobb Grantham and Julia Houten.

Law Offices of Lynn E. Moyer, Lynn E. Moyer; Law Office of Kent M. Bridwell and Kent M. Bridwell for Rev. Jose Poch et al., and Rev. William A. Thompson et al., as Amici Curiae on behalf of Defendants and Respondents Rev. Praveen Bunyan, Rev. Richard A. Menees, Rev. M. Kathleen Adams, The Rector, Wardens and Vestrymen of St. James Parish in Newport Beach, California, James Dale, Barbara Hettinga, Paul Stanley, Cal Trent, John McLaughlin, Penny Reveley, Mike Thompson, Jill Austin, Eric Evans, Frank Daniels, Cobb Grantham and Julia Houten.

Law Offices of Penner, Bradley & Buettner, Randall M. Penner; Mayer Brown, Donald Falk and Eugene Volokh for The Presbyterian Lay Committee as Amicus Curiae on behalf of Defendants and Respondents Rev. Praveen Bunyan, Rev. Richard A. Menees, Rev. M. Kathleen Adams, The Rector,

Wardens and Vestrymen of St. James Parish in Newport Beach, California, James Dale, Barbara Hettinga, Paul Stanley, Cal Trent, John McLaughlin, Penny Reveley, Mike Thompson, Jill Austin, Eric Evans, Frank Daniels, Cobb Grantham and Julia Houten.

Kenneth W. Starr; and Robert F. Cochran, Jr., for Iglesia Evangelica Latina, Inc., Juan A. Reyes, Aida Haydee Reyes, Ahuner Portillo, Audias J. Portillo, Baldemar Contreras, Benjamin Carranza, Camilo Encina, Christian Sical, Edwin Perez, Edwing Morales, Enrique Luna, Esbin Portillo, Beltran Fermin, Francisco Fuentes, Carlos G. Garcia, Henry Portillo, Jose Campos, Jose Alfredo Jiminez, Misael Portillo, Nelson Sosa, Noe Carias, Roberto Estrada, Jonathan Evangelista, Saul Cifuentes, Victor Jacobo, Bildad Coin, Jose Ruben Reyes, Alex Reyes, Jose Antonio Menjivar, Amado Morroquin, Epifanio Zepeda and Jose Luz Araujo as Amici Curiae on behalf of Defendants and Respondents Rev. Praveen Bunyan, Rev. Richard A. Menees, Rev. M. Kathleen Adams, The Rector, Wardens and Vestrymen of St. James Parish in Newport Beach, California, James Dale, Barbara Hettinga, Paul Stanley, Cal Trent, John McLaughlin, Penny Reveley, Mike Thompson, Jill Austin, Eric Evans, Frank Daniels, Cobb Grantham and Julia Houten.

Wild, Carter & Tipton and Russell G. VanRozeboom for The Diocese of San Joaquin as Amicus Curiae on behalf of Defendants and Respondents Rev. Praveen Bunyan, Rev. Richard A. Menees, Rev. M. Kathleen Adams, The Rector, Wardens and Vestrymen of St. James Parish in Newport Beach, California, James Dale, Barbara Hettinga, Paul Stanley, Cal Trent, John McLaughlin, Penny Reveley, Mike Thompson, Jill Austin, Eric Evans, Frank Daniels, Cobb Grantham and Julia Houten.

Allan E. Wilion for Thomas Lee and Rev. Peter Min as Amici Curiae on behalf of Defendants and Respondents Rev. Praveen Bunyan, Rev. Richard A. Menees, Rev. M. Kathleen Adams, The Rector, Wardens and Vestrymen of St. James Parish in Newport Beach, California, James Dale, Barbara Hettinga, Paul Stanley, Cal Trent, John McLaughlin, Penny Reveley, Mike Thompson, Jill Austin, Eric Evans, Frank Daniels, Cobb Grantham and Julia Houten.

## OPINION

**CHIN, J.**—In this case, a local church has disaffiliated itself from a larger, general church with which it had been affiliated. Both the local church and the general church claim ownership of the local church building and the property on which the building stands. The parties have asked the courts of this state to resolve this dispute. When secular courts are asked to resolve an internal church dispute over property ownership, obvious dangers exist that

the courts will become impermissibly entangled with religion. Nevertheless, when called on to do so, secular courts must resolve such disputes. We granted review primarily to decide how the secular courts of this state should resolve disputes over church property.

State courts must not decide questions of religious doctrine; those are for the church to resolve. Accordingly, if resolution of the property dispute involves a doctrinal dispute, the court must defer to the position of the highest ecclesiastical authority that has decided the doctrinal point. But to the extent the court can resolve the property dispute without reference to church doctrine, it should use what the United States Supreme Court has called the " 'neutral principles of law' " approach. (*Jones v. Wolf* (1979) 443 U.S. 595, 597 [61 L.Ed.2d 775, 99 S.Ct. 3020].) The court should consider sources such as the deeds to the property in dispute, the local church's articles of incorporation, the general church's constitution, canons, and rules, and relevant statutes, including statutes specifically concerning religious property, such as Corporations Code section 9142.

Applying the neutral principles of law approach, we conclude, on this record, that the general church, not the local church, owns the property in question. Although the deeds to the property have long been in the name of the local church, that church agreed from the beginning of its existence to be part of the greater church and to be bound by its governing documents. These governing documents make clear that church property is held in trust for the general church and may be controlled by the local church only so long as that local church remains a part of the general church. When it disaffiliated from the general church, the local church did not have the right to take the church property with it.

We must also resolve the preliminary procedural question of whether this action is subject to a special motion to dismiss under Code of Civil Procedure section 425.16—generally called an "anti-SLAPP motion."[1] We conclude that this action is not subject to an anti-SLAPP motion. Although protected activity arguably lurks in the background of this case, the actual dispute concerns property ownership rather than any such protected activity. Accordingly, this action is not one "arising from" protected activity within the meaning of Code of Civil Procedure section 425.16, subdivision (b)(1). Hence, that provision does not apply.

We affirm the judgment of the Court of Appeal, which reached the same conclusions, although not always for the same reasons.

---

[1] The acronym "SLAPP" stands for "strategic lawsuit against public participation." (See *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57 & fn. 1 [124 Cal.Rptr.2d 507, 52 P.3d 685].)

## I. FACTS AND PROCEDURAL HISTORY

"The Protestant Episcopal Church in the United States of America . . . , organized in 1789, was the product of secession of the Anglican church in the colonies from the Church of England, the latter church itself being the product of secession from the Church of Rome in 1534." (*Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599, 606 [171 Cal.Rptr. 541].) The church (hereafter the Episcopal Church) is governed by a general convention and a presiding bishop. In the United States, the Episcopal Church is divided geographically into dioceses, including the Episcopal Diocese of Los Angeles (Los Angeles Diocese). Each diocese is governed by a diocesan convention and a bishop. A diocese is itself divided into missions and parishes, which are individual churches where members meet to worship. A parish is governed by a rector and a board of elected laypersons called the vestry. (See *Protestant Episcopal Church v. Barker, supra*, at pp. 606–607.) One such parish within the Los Angeles Diocese was St. James Parish in Newport Beach (St. James Parish).

St. James Parish began as a mission of the Episcopal Church in 1946. In 1947, members of the mission sought permission from the Los Angeles Diocese to organize as a parish. The members' handwritten application "promise[d] and declare[d] that the said Parish shall be forever held under, and conform to and be bound by, the Ecclesiastical authority of the Bishop of Los Angeles, and of his successor in office, the Constitution and Canons of the [Episcopal Church], and the Constitution and Canons of the Diocese of Los Angeles." Articles of Incorporation of St. James Parish, filed with the California Secretary of State on March 1, 1949, stated that the corporation was formed "[t]o establish and maintain a Parish which shall form a constituent part of the Diocese of Los Angeles in [the Episcopal Church]; and so that the Constitution and Canons, Rules, Regulations and Discipline of said Church . . . and the Constitution and Canons in the Diocese of Los Angeles, for the time being shall, unless they be contrary to the laws of this State, always form a part of the By-Laws and Articles of Incorporation of the corporation hereby formed and shall prevail against and govern anything herein contained that may appear repugnant to such Constitutions, Canons, Rules, Regulations and Discipline . . . ." In 1991, St. James Parish amended its articles of incorporation, but it did not modify these provisions.

In 1950, the "Bishop of the Protestant Episcopal Church in Los Angeles" deeded the property on which the church building stands to St. James Parish for consideration of "less than $100.00." The deeds to the property have been in the name of the local church ever since.

Canon II.6 of the canons of the general convention of the Episcopal Church provides: "Sec. 1. No Church or Chapel shall be consecrated until the

Bishop shall have been sufficiently satisfied that the building and the ground on which it is erected are secured for ownership and use by a Parish, Mission, Congregation, or Institution affiliated with this Church and subject to its Constitution and Canons.

"Sec. 2. It shall not be lawful for any Vestry, Trustees, or other body authorized by laws of any State or Territory to hold property for any Diocese, Parish or Congregation, to encumber or alienate any dedicated and consecrated Church or Chapel, or any Church or Chapel which has been used solely for Divine Service, belonging to the Parish or Congregation which they represent, without the previous consent of the Bishop, acting with the advice and consent of the Standing Committee of the Diocese.

"Sec. 3. No dedicated and consecrated Church or Chapel shall be removed, taken down, or otherwise disposed of for any worldly or common use, without the previous consent of the Standing Committee of the Diocese.

"Sec. 4. Any dedicated and consecrated Church or Chapel shall be subject to the trust declared with respect to real and personal property held by any Parish, Mission, or Congregation as set forth in Canon I.7.4."

The record shows, and no one disputes, that the Episcopal Church first adopted the original versions of sections 2 and 3 of Canon II.6 in 1868. It added section 1 of that Canon in 1871 and section 4 in 1979 when it amended Canon I.7.

In 1979, in apparent response to that year's United States Supreme Court opinion in *Jones v. Wolf, supra*, 443 U.S. 595, the Episcopal Church added section 4 to Canon I.7 (Canon I.7.4), which provides: "All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons."

Recently, as a result of a doctrinal dispute, St. James Parish disaffiliated itself from the Episcopal Church. It appears that the dispute leading to the decision to disaffiliate arose after the national church ordained an openly gay man as a bishop in New Hampshire in 2003. Some members of the Episcopal Church, including members of St. James Parish, disagreed with this ordination. In July 2004, the board of St. James Parish voted to end its affiliation with the Episcopal Church and to affiliate with the Anglican Church of

Uganda. A majority of the congregation voted to support the decision. After the disaffiliation, a further dispute arose as to who owned the church building that St. James Parish used for worship and the property on which the building stands—the local church that left the Episcopal Church or the higher church authorities.

To resolve this dispute, the Los Angeles Diocese and various individuals, including a dissenter from the decision by St. James Parish to disaffiliate (hereafter collectively Los Angeles Diocese), sued various individuals connected with St. James Parish (defendants) alleging eight property-recovery-related causes of action. Later, the national Episcopal Church successfully sought to intervene on the side of the Los Angeles Diocese and filed its own complaint in intervention against defendants. In essence, both sides in this litigation, i.e., defendants on one side, and the Los Angeles Diocese and Episcopal Church allied on the other side, claim ownership of the local church building and property on which it stands.

Defendants moved to strike the Los Angeles Diocese's lawsuit as a SLAPP suit under Code of Civil Procedure section 425.16. The trial court granted the motion and dismissed the action without leave to amend, finding both that the action was a SLAPP suit and that plaintiffs had not established a probability that they would prevail. The court later sustained without leave to amend defendants' demurrer to the Episcopal Church's complaint in intervention and dismissed that action. The Los Angeles Diocese and the Episcopal Church appealed the dismissals. The Court of Appeal consolidated the appeals and reversed the judgments. That court ruled that the action was not a SLAPP suit subject to the special motion to strike, and that the higher church authorities, not defendants, own the disputed property.

We granted review to decide whether this action is subject to the special motion to strike under Code of Civil Procedure section 425.16 and to address the merits of the church property dispute.

## II. Discussion

### A. Special Motion to Strike Under Code of Civil Procedure Section 425.16

Before considering the merits of the property dispute, we must decide a preliminary procedural question. Subdivision (b)(1) of Code of Civil Procedure section 425.16 (section 425.16) provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special

motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Defendants filed a special motion to strike under this section—a "so-called anti-SLAPP motion." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131 [104 Cal.Rptr.2d 377, 17 P.3d 735].) The trial court found that section 425.16 governs the action the Los Angeles Diocese filed and, further finding plaintiffs had not shown a probability they would prevail, granted the special motion to strike. The Court of Appeal concluded that the action was not a SLAPP suit. We agree with the Court of Appeal.

■ "[S]ection 425.16 requires that a court engage in a two-step process when determining whether a defendant's anti-SLAPP motion should be granted. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76 [124 Cal.Rptr.2d 519, 52 P.3d 695].) Defendants argue that this action arose from their protected activity in first expressing disagreement with the higher church authorities regarding church governance and then disaffiliating from the general church.

The Los Angeles Diocese's complaint did allege facts concerning the reasons defendants decided to disaffiliate from the greater church. Nevertheless, we conclude the action did not arise from protected activity within the meaning of section 425.16. As the Court of Appeal aptly stated, "The flaw in this thinking is that it confuses the *motivation for the disaffiliation* with the claims made by the general church about the *use of church property*. [¶] . . . [I]t makes no difference *why* defendants are disaffiliating; the point is they are being sued for asserting *control over the local parish property* to the exclusion of a *right to control asserted by plaintiffs*."

"[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute. [Citation.] Moreover, that a cause of action arguably may have been 'triggered' by protected activity does not entail that it is one arising from such. [Citation.] In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 [124 Cal.Rptr.2d 530, 52 P.3d 703].) In filing this action, the Los Angeles Diocese sought to resolve a *property dispute*. The property dispute is based on the fact that both sides claim ownership of the same property. This dispute, and not any protected activity, is "the gravamen or principal thrust" of the action. (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th

181, 193 [6 Cal.Rptr.3d 494].) The additional fact that protected activity may lurk in the background—and may explain why the rift between the parties arose in the first place—does not transform a property dispute into a SLAPP suit. Accordingly, the trial court erred in treating this as a SLAPP suit subject to section 425.16's special motion to dismiss.

### B. Resolving the Dispute over the Church Property

Both lower courts also addressed the merits of the dispute over ownership of the local church—the trial court found in favor of the local church and the Court of Appeal found clear and convincing evidence in favor of the general church. We will also address this question, which the parties as well as various amici curiae have fully briefed. We will first consider what method the secular courts of this state should use to resolve disputes over church property. We will then apply that method to analyze the dispute of this case.

### 1. How California Courts Should Resolve Disputes over Church Property

Decisions from both this court and the United States Supreme Court have made clear that, when asked to do so, secular courts may, indeed must, resolve internal church disputes over ownership of church property. As the high court put it in the seminal 19th-century case involving a church property dispute, "an appeal is made to the secular authority; the courts when so called on must perform their functions as in other cases. [¶] Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints." (*Watson v. Jones* (1871) 80 U.S. 679, 714 [20 L.Ed. 666].) Similarly, in its most recent decision involving a church property dispute, the court stated, "There can be little doubt about the general authority of civil courts to resolve this question. The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." (*Jones v. Wolf, supra,* 443 U.S. at p. 602.) (For cases from this court, see, e.g., *Rosicrucian Fellow v. Rosicrucian Etc. Ch.* (1952) 39 Cal.2d 121, 131 [245 P.2d 481]; *Wheelock v. First Presb. Church* (1897) 119 Cal. 477, 482 [51 P. 841].)

But when called on to resolve church property disputes, secular courts must not entangle themselves in disputes over church doctrine or infringe on the right to free exercise of religion. In this regard, the United States Supreme Court has made two points clear: (1) how state courts resolve church property disputes is a matter of state law; but (2) the method a state chooses must not

violate the First Amendment to the United States Constitution.[2] "[T]he First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. [Citations.] As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. [Citations.] Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, 'a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.' " (*Jones v. Wolf, supra*, 443 U.S. at p. 602, quoting *Md. & Va. Churches v. Sharpsburg Ch.* (1970) 396 U.S. 367, 368 [24 L.Ed.2d 582, 90 S.Ct. 499] (conc. opn. of Brennan, J.).)

The high court found invalid, for example, a method used in Georgia whereby "the right to the property previously used by the local churches was made to turn on a civil court jury decision as to whether the general church abandoned or departed from the tenets of faith and practice it held at the time the local churches affiliated with it." (*Presbyterian Church v. Hull Church, supra*, 393 U.S. at p. 441.) The court held that "the civil courts [have] *no* role in determining ecclesiastical questions in the process of resolving property disputes." (*Id.* at p. 447.) It explained that the First Amendment "commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." (*Hull Church*, at p. 449.) The court concluded that the "departure-from-doctrine" approach "requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role." (*Id.* at p. 450; see also *Serbian Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696, 698 [49 L.Ed.2d 151, 96 S.Ct. 2372] ["inquiries made by the Illinois Supreme Court into matters of ecclesiastical cognizance and polity and the court's actions pursuant thereto contravened the First and Fourteenth Amendments"].) The court remanded the matter to the Georgia Supreme Court to develop a new method for resolving church property disputes. (*Hull Church*, at pp. 450–452.)

---

[2] As relevant here, the First Amendment to the United States Constitution (First Amendment) provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." (See *Kedroff v. St. Nicholas Cathedral* (1952) 344 U.S. 94, 100, fn. 5 [97 L.Ed. 120, 73 S.Ct. 143].) Although the amendment refers solely to Congress, its restraints apply to the states through the Fourteenth Amendment. (See *Presbyterian Church v. Hull Church* (1969) 393 U.S. 440, 441 [21 L.Ed.2d 658, 89 S.Ct. 601].)

The high court has approved two methods for adjudicating church property disputes. The first approach is one the court itself adopted in the 19th century. (*Watson v. Jones, supra*, 80 U.S. 679.)[3] This approach is often called the "principle of government" approach. (See *Watson v. Jones, supra*, 80 U.S. at p. 725.) The *Watson v. Jones* court distinguished between two types of church disputes. One "has reference to the case of a church of a strictly congregational or independent organization, governed solely within itself . . . ; and to property held by such a church, either by way of purchase or donation, with no other specific trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society." (*Id.* at pp. 724–725.) "In such cases," the court explained, "where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations." (*Id.* at p. 725.) Another type, which the court said "is the one which is oftenest found in the courts," involves a hierarchical structure, i.e., a "religious congregation which is itself part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government." (*Id.* at p. 726.) In the latter case, the court said, "we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." (*Id.* at pp. 726–727.)

The court adopted this test for a hierarchical church: "[W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (*Watson v. Jones, supra*, 80 U.S. at p. 727; see also *Serbian Orthodox Diocese v. Milivojevich, supra*, 426 U.S. at p. 710 [quoting this language and describing it as the rule applicable to "hierarchical churches"].)

The second approach the high court has approved is what it called the " 'neutral principles of law' " approach. (*Jones v. Wolf, supra*, 443 U.S. at p. 597.) The court first mentioned such a possible approach in *Presbyterian Church v. Hull Church, supra*, 393 U.S. 440: "And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." (*Id.* at p. 449.) A year later, in a brief *per curiam* opinion, the high court upheld

---

[3] As the high court later explained, *Watson v. Jones, supra*, 80 U.S. 679, predated *Erie R. Co. v. Tompkins* (1938) 304 U.S. 64 [82 L.Ed. 1188, 58 S.Ct. 817] and, accordingly, "it was based on general federal law rather than the state law of the forum in which it was brought." (*Serbian Orthodox Diocese v. Milivojevich, supra*, 426 U.S. at p. 710, fn. 5.)

Maryland's resolution of a church property dispute that "relied upon provisions of state statutory law governing the holding of property by religious corporations, upon language in the deeds conveying the properties in question to the local church corporations, upon the terms of the charters of the corporations, and upon provisions in the constitution of the General Eldership pertinent to the ownership and control of church property." (*Md. & Va. Churches v. Sharpsburg Ch., supra*, 396 U.S. at p. 367, fn. omitted.)[4] Because this approach "involved no inquiry into religious doctrine," the high court dismissed the appeal as one involving no substantial federal question. (396 U.S. at p. 368; see also *id.* at p. 370 (conc. opn. of Brennan, J.) [discussing the neutral principles approach in greater detail].)

The high court definitively approved the neutral principles approach in *Jones v. Wolf, supra*, 443 U.S. 595, a 1979 decision that is the high court's most recent on this subject and, hence, is of critical importance to the instant dispute. After that court had invalidated Georgia's method for resolving church property disputes (*Presbyterian Church v. Hull Church, supra*, 393 U.S. 440), Georgia adopted a new approach. The high court considered that new approach in *Jones v. Wolf, supra*, 443 U.S. 595. It summarized the issue at the outset: "This case involves a dispute over the ownership of church property following a schism in a local church affiliated with a hierarchical church organization. The question for decision is whether civil courts, consistent with the First and Fourteenth Amendments to the Constitution, may resolve the dispute on the basis of 'neutral principles of law,' or whether they must defer to the resolution of an authoritative tribunal of the hierarchical church." (*Id.* at p. 597.)

The high court reviewed three Georgia Supreme Court opinions that postdated the remand in *Presbyterian Church v. Hull Church, supra*, 393 U.S. 440. It explained that after the remand, the Georgia Supreme Court "adopted what is now known as the 'neutral principles of law' method for resolving

---

[4] Although the high court originally referred to "neutral principles of law, developed for use in all property disputes" (*Presbyterian Church v. Hull Church, supra*, 393 U.S. at p. 449), it later made clear that such neutral principles may include application of statutes specifically governing religious property. (*Md. & Va. Churches v. Sharpsburg Ch., supra*, 396 U.S. at p. 367; see also *id.* at p. 370 (conc. opn. of Brennan, J.).) As the high court explained in *Jones v. Wolf, supra*, 443 U.S. at pages 602–603, "The neutral-principles approach was approved in [*Md. & Va. Churches v. Sharpsburg Ch.*], an appeal from a judgment of the Court of Appeals of Maryland settling a local church property dispute on the basis of the language of the deeds, the terms of the local church charters, *the state statutes governing the holding of church property*, and the provisions in the constitution of the general church concerning the ownership and control of church property." (Italics added.)

A statute governing specifically church property obviously is not developed for use in all property disputes, but, as the high court has made clear, it may still be considered in applying neutral principles of law as that court defines the term. Such a statute is—or must be—neutral in the sense that it does not require state courts to resolve questions of religious doctrine.

church property disputes. The [Georgia Supreme Court] examined the deeds to the properties, the state statutes dealing with implied trusts [citation], and the Book of Church Order to determine whether there was any basis for a trust in favor of the general church." (*Jones v. Wolf, supra,* 443 U.S. at p. 600.) In all three of the Georgia Supreme Court cases, the deeds to the disputed property were in the name of the local church. In two of them, including the case the *Jones v. Wolf* court was reviewing, no statute or church document created a trust in favor of the general church. In those cases, the Georgia Supreme Court awarded the property to the local church. (*Id.* at pp. 600–601.) In the third case, however, involving a dispute within the United Methodist Church, the high court explained that the Georgia Supreme Court "observed, however, that the constitution of The United Methodist Church, its Book of Discipline, contained an express trust provision in favor of the general church. On this basis, the church property was awarded to the denominational church." (*Ibid.,* fn. omitted.)

The *Jones v. Wolf* court upheld Georgia's neutral principles approach, although it remanded the particular case to the Georgia Supreme Court for further proceedings on a narrow point irrelevant to the issue of this case.[5] It recognized advantages inherent in that approach. "The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general— flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members." (*Jones v. Wolf, supra,* 443 U.S. at pp. 603–604.)

---

[5] The Georgia Supreme Court had also resolved a dispute over which of two local factions properly represented the local church. The high court was concerned that the Georgia Supreme Court had not adequately explained its reasoning. Specifically, the Georgia Supreme Court did not explain whether it simply applied majority rule—which the high court indicated would be permissible—or whether the decision "involve[d] considerations of religious doctrine and polity"—which the high court indicated would not be permissible. (*Jones v. Wolf, supra,* 443 U.S. at p. 608.) The high court remanded the matter to permit the Georgia Supreme Court to articulate the reasons it concluded one particular faction represented the local church. (*Id.* at pp. 609–610.) This case presents no such issue.

The court also recognized potential difficulties inherent in the neutral principles approach. "The neutral-principles method, at least as it has evolved in Georgia, requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." (*Jones v. Wolf, supra,* 443 U.S. at p. 604.)

Despite these potential difficulties, the high court concluded that "the promise of nonentanglement and neutrality inherent in the neutral-principles approach more than compensates for what will be occasional problems in application. These problems, in addition, should be gradually eliminated as recognition is given to the obligation of 'States, religious organizations, and individuals [to] structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.' [Citation.] We therefore hold that a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." (*Jones v. Wolf, supra,* 443 U.S. at p. 604, quoting *Presbyterian Church v. Hull Church, supra,* 393 U.S. at p. 449.)

Early cases from this court resolving church property disputes generally cited *Watson v. Jones, supra,* 80 U.S. 679, the only then existing United States Supreme Court decision on the subject. (See *Rosicrucian Fellow v. Rosicrucian Etc. Ch., supra,* 39 Cal.2d at p. 131; *Committee of Missions v. Pacific Synod* (1909) 157 Cal. 105, 122 [106 P. 395]; *Horsman v. Allen* (1900) 129 Cal. 131, 135 [61 P. 796]; *Wheelock v. First Presb. Church, supra,* 119 Cal. at p. 485; *Baker v. Ducker* (1889) 79 Cal. 365, 374 [21 P. 764].) This court has not had occasion to consider the neutral principles approach in a church property case since its development.[6] The Courts of Appeal have, however, adopted and consistently used it. (*Concord Christian Center v. Open*

---

[6] In a case not involving a church property dispute, we described "the rule that the state must accept the decision of appropriate church authorities on . . . matters [of religious doctrine and internal church governance]" as "the rule of the so-called church property cases." (*Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 541 [10 Cal.Rptr.3d 283, 85 P.3d 67].) As *Jones v. Wolf, supra,* 443 U.S. 595, makes clear, this rule does indeed apply to church property cases even under the neutral principles approach. Because no church property dispute existed in *Catholic Charities of Sacramento, Inc. v. Superior Court,* we did not consider whether neutral principles of law can be used to resolve such disputes.

*Bible Standard Churches* (2005) 132 Cal.App.4th 1396, 1411 [34 Cal.Rptr.3d 412]; *California-Nevada Annual Conf. of the United Methodist Church v. St. Luke's United Methodist Church* (2004) 121 Cal.App.4th 754, 762–764 [17 Cal.Rptr.3d 442]; *Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik* (2004) 118 Cal.App.4th 919, 930 [13 Cal.Rptr.3d 552]; *Singh v. Singh* (2004) 114 Cal.App.4th 1264, 1280–1281 [9 Cal.Rptr.3d 4]; *Korean United Presbyterian Church v. Presbytery of the Pacific* (1991) 230 Cal.App.3d 480, 497–499, 503 [281 Cal.Rptr. 396]; *Protestant Episcopal Church v. Barker, supra,* 115 Cal.App.3d at p. 615; *Presbytery of Riverside v. Community Church of Palm Springs* (1979) 89 Cal.App.3d 910, 919–923 [152 Cal.Rptr. 854] (*Presbytery of Riverside*); *In re Metropolitan Baptist Church of Richmond, Inc.* (1975) 48 Cal.App.3d 850, 858–859 [121 Cal.Rptr. 899]; see also *Metropolitan Philip v. Steiger* (2000) 82 Cal.App.4th 923, 929, fn. 7 [98 Cal.Rptr.2d 605] [not deciding whether the neutral principles approach is valid because the case turned on an ecclesiastical dispute requiring the court to defer to the ecclesiastical authorities].)

The Court of Appeal in this case criticized these Court of Appeal decisions for, in its view, violating principles of stare decisis. The Court of Appeal believed that early cases of this court specifically adopted the principle of government approach, thus precluding the more recent Courts of Appeal from adopting the neutral principles approach. We disagree. As explained in the Court of Appeal opinion containing the most thorough examination of this question (*Presbytery of Riverside, supra,* 89 Cal.App.3d 910), the principle of government method of *Watson v. Jones, supra,* 80 U.S. 679, and the neutral principles method of *Jones v. Wolf, supra,* 443 U.S. 595, are not mutually exclusive, but can be reconciled.[7] In any event, this court unquestionably has authority to adopt the neutral principles approach.

*Watson v. Jones, supra,* 80 U.S. at page 727, held that secular courts must accept as binding any church adjudication regarding "questions of discipline, or of faith, or ecclesiastical rule, custom, or law . . . ." As *Jones v. Wolf, supra,* 443 U.S. 595, makes clear, this remains the rule. Secular courts may not decide questions involving church doctrine or faith. But this rule does not prevent courts from using neutral principles of law to resolve a church property dispute that does not turn on questions of church doctrine: "However, when the dispute to be resolved is essentially ownership or right to possession of property, the civil courts appropriately adjudicate the controversy even though it may arise out of a dispute over doctrine or other ecclesiastical question, provided the court can resolve the property dispute

---

[7] The opinion of *Presbytery of Riverside, supra,* 89 Cal.App.3d 910, actually predated *Jones v. Wolf, supra,* 443 U.S. 595, by a few months, but it considered the discussion of "neutral principles of law" found in *Presbyterian Church v. Hull Church, supra,* 393 U.S. 440. (*Presbytery of Riverside, supra,* at pp. 920–924 & fn. 2.)

without attempting to resolve the underlying ecclesiastical controversy." (*Presbytery of Riverside, supra*, 89 Cal.App.3d at p. 920.) As the *Presbytery of Riverside* court explained, "[i]n *Watson* v. *Jones* the court was asked to decree the termination of an implied trust because of alleged departures from doctrine by the general church. (See *Presbyterian Church* v. *Hull Church, supra*, 393 U.S. at p. 445 . . . .) Thus the dispute involved in the case was purely ecclesiastical." (*Id.* at p. 921.)

■   The *Presbytery of Riverside* court also discussed early decisions of this court and concluded that, although they cited and applied the rule of *Watson* v. *Jones, supra*, 80 U.S. 679, they do not preclude use of neutral principles of law to decide church property disputes that do not turn on questions of church doctrine. (*Presbytery of Riverside, supra*, 89 Cal.App.3d at pp. 922–923.) As did the court in *Protestant Episcopal Church* v. *Barker, supra*, 115 Cal.App.3d at page 614 (and implicitly the more recent Court of Appeal decisions using the neutral principles approach), we find the discussion in *Presbytery of Riverside, supra*, 89 Cal.App.3d 910, persuasive. Subject to the proviso that secular courts may not decide questions of church doctrine, we believe that California courts should use neutral principles of law to decide church property disputes.

Accordingly, we conclude that secular courts called on to resolve church property disputes should proceed as follows: State courts must not decide questions of religious doctrine; those are for the church to resolve. Accordingly, if resolution of a property dispute involves a point of doctrine, the court must defer to the position of the highest ecclesiastical authority that has decided the point. But to the extent the court can resolve a property dispute without reference to church doctrine, it should apply neutral principles of law. The court should consider sources such as the deeds to the property in dispute, the local church's articles of incorporation, the general church's constitution, canons, and rules, and relevant statutes, including statutes specifically concerning religious property, such as Corporations Code section 9142. (See *Jones* v. *Wolf, supra*, 443 U.S. at p. 600 [upholding Georgia's use of such sources]; *Md. & Va. Churches* v. *Sharpsburg Ch., supra*, 396 U.S. 367 [upholding Maryland's use of such sources]; *Protestant Episcopal Church* v. *Barker, supra*, 115 Cal.App.3d at p. 621.)

### 2.   *Resolving the Dispute of This Case*

St. James Parish holds record title to the property in question. That is the fact that defendants rely on most heavily in claiming ownership. On the other hand, from the beginning of its existence, St. James Parish promised to be bound by the constitution and canons of the Episcopal Church. Such commitment is found in the original application to the higher church authorities to

organize as a parish and in the articles of incorporation. Canon I.7.4, adopted in 1979, provides that property held by a local parish "is held in trust" for the general church and the diocese in which the local church is located. The same canon states that the trust does not limit the authority of the parish over the property "so long as the particular Parish . . . remains a part of, and subject to, this Church and its Constitution and Canons." Other canons adopted long before St. James Parish existed also contained substantial restrictions on the local use of church property.

The question before us is, which prevails—the fact that St. James Parish holds record title to the property, or the facts that it is bound by the constitution and canons of the Episcopal Church and the canons impress a trust in favor of the general church? In deciding this question, we are not entirely free from constitutional constraints. Once again, *Jones v. Wolf, supra*, 443 U.S. 595, is important to this question. Although that decision permitted the states to use the neutral principles approach, it also made clear that in applying that approach, state courts must neither become entangled in religious matters nor, especially important to the instant dispute, violate the First Amendment right to free exercise of religion. *Jones v. Wolf* was a five-to-four decision, with the dissent arguing that the First Amendment compels use of the principle of government approach of *Watson v. Jones, supra*, 80 U.S. 679—under which the higher church authorities would necessarily win. Normally, the dissent would not be of great significance to this court, because we are bound by the majority opinion concerning federal constitutional questions. But the majority responded to some of the dissent's specific arguments. The dissent is important to give context and meaning to the majority's response.

The dissent argued that "in each case involving an intrachurch dispute—including disputes over church property—the civil court must focus directly on ascertaining, and then following, the decision made within the structure of church governance. . . . [B]y recognizing the authoritative resolution reached within the religious association, the civil court avoids interfering indirectly with the religious governance of those who have formed the association and submitted themselves to its authority." (*Jones v. Wolf, supra*, 443 U.S. at p. 618 (dis. opn. of Powell, J.), fn. omitted.) The majority responded to this point, which it described as an argument "that a rule of compulsory deference is necessary in order to protect the free exercise rights 'of those who have formed the association and submitted themselves to its authority.' " (*Jones v. Wolf, supra*, at pp. 605–606.) Significantly, the majority did not deny that free exercise rights require a secular court to defer to decisions made within a religious association when local churches have submitted themselves to the authority of that association. Rather, the majority argued that the neutral principles approach is consistent with this requirement.

The dissent's argument, the *Jones v. Wolf* majority stated, "assumes that the neutral-principles method would somehow frustrate the free-exercise rights of the members of a religious association. Nothing could be further from the truth. The neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. *At any time before the dispute erupts*, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church.* The burden involved in taking such steps will be minimal. *And the civil courts will be bound to give effect to the result indicated by the parties*, provided it is embodied in some legally cognizable form." (*Jones v. Wolf, supra*, 443 U.S. at p. 606, italics added.)

Shortly after this decision, and in apparent reaction to it, the Episcopal Church added Canon I.7.4, which recites an express trust in favor of the denominational church. This occurred some 25 years before the instant dispute erupted. Defendants focus on the high court's reference to what the "parties" can do, and argue that Canon I.7.4, to be effective, had to have been enacted by the parties—in other words, that some kind of agreement must have been reached between the general church and St. James Parish (and presumably every other parish in the country) ratifying Canon I.7.4. We do not so read the high court's words. Use of the passive voice in describing the possible "alternative[]" of making the general church's constitution recite the trust suggests the high court intended that this could be done by whatever method the church structure contemplated. Requiring a particular method to change a church's constitution—such as requiring every parish in the country to ratify the change—*would* infringe on the free exercise rights of religious associations to govern themselves as they see fit. It would impose a major, not a "minimal," burden on the church governance. (*Jones v. Wolf, supra*, 443 U.S. at p. 606.)

Thus, the high court's discussion in *Jones v. Wolf, supra*, 443 U.S. at page 606, together with the Episcopal Church's adoption of Canon I.7.4 in response, strongly supports the conclusion that, once defendants left the general church, the property reverted to the general church. Moreover, Canon I.7.4 is consistent with earlier-enacted canons that, although not using the word "trust," impose substantial limitations on the local parish's use of church property and give the higher church authorities substantial authority over that property. For example, permitting a disaffiliating local church to take the property with it when it reaffiliates with a different church is

inconsistent with the prohibition of Canon II.6, section 2, against encumbering or alienating local property without the previous consent of higher church authorities. Thus, a strong argument exists that Canon I.7.4 merely codified what had long been implicit. As we discuss below, this is the conclusion reached by some of the out-of-state decisions that awarded property to the national Episcopal Church in similar disputes.

A California statutory provision that was enacted shortly after *Jones v. Wolf, supra,* 443 U.S. 595, and that is consistent with the language quoted above from page 606 of that decision, also supports the conclusion that the property now belongs to the general church. As relevant, subdivisions (c) and (d) of Corporations Code section 9142 (section 9142), which were enacted in 1982 (Stats. 1982, ch. 242, § 1, p. 784), provide:

"(c) No assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless *one* of the following applies: [¶] . . . [¶]

"(2) Unless, and only to the extent that, the articles or bylaws of the corporation, *or the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide.* [¶] . . . [¶]

"(d) Trusts created by paragraph (2) of subdivision (c) may be amended or dissolved by amendment from time to time to the articles, bylaws, or governing instruments *creating the trusts. . . .*" (Italics added.)

■ This statute appears to be the type of statute the United States Supreme Court had in mind when it approved reliance on "provisions of state statutory law governing the holding of property by religious corporations . . . ." (*Md. & Va. Churches v. Sharpsburg Ch., supra,* 396 U.S. at p. 367, fn. omitted.) Justice Brennan fleshed out the point in his concurring opinion in that case. He explained that one possible approach to resolving church property disputes "is the passage of special statutes governing church property arrangements in a manner that precludes state interference in doctrine. Such statutes must be carefully drawn to leave control of ecclesiastical polity, as well as doctrine, to church governing bodies." (*Id.* at p. 370 (conc. opn. of Brennan, J.).) Section 9142, subdivisions (c) and (d), does not permit state interference in religious doctrine and leaves control of ecclesiastical polity and doctrine to the church. Subdivision (c) of that section permits the governing instruments of the general church to create an express trust in church property, which Canon I.7.4 does. Subdivision (d) permits changing a trust, but only if done in the instrument that *created* it. Canon I.7.4 has not

been amended. So it would appear that this statute also compels the conclusion that the general church owns the property now that defendants have left the general church.

Defendants argue that section 9142 states only a negative conditional, not a positive imperative. In other words, in their view, the statutory provisions are *minimum* requirements for impression of a trust on local religious property, and do not necessarily exclude other requirements therefor. Defendants focus on the grammatical construction of subdivision (c), and its repeated use of the word "unless." As defendants would have it, there is *never* a trust "unless" one of the statutory provisions is present, but this does not mean there is *always* a trust when one or more of the provisions *is* present. But this interpretation overlooks subdivision (d) of section 9142. That subdivision provides that "[t]rusts *created by* paragraph (2) of subdivision (c) may be amended or dissolved by amendment from time to time to the articles, bylaws, or governing instruments *creating the trusts. . . .*" (Italics added.) Thus, subdivision (d) appears clearly to indicate that, under California law, a trust *is created* by compliance with any one of the alternatives set forth in subdivision (c)(2), and it can only be altered or dissolved by amending the creating instrument.

■ In short, St. James Parish agreed from the beginning of its existence to be part of a greater denominational church and to be bound by that greater church's governing instruments. Those instruments make clear that a local parish owns local church property in trust for the greater church and may use that property only so long as the local church remains part of the greater church. Respect for the First Amendment free exercise rights of persons to enter into a religious association of their choice, as delineated in *Jones v. Wolf,* *supra,* 443 U.S. 595 (as well as the provisions of § 9142), requires civil courts to give effect to the provisions and agreements of that religious association. To adapt a similar conclusion in a recent Court of Appeal decision involving a different religious association, "In summary, [St. James Parish] is bound by the constitution, laws, rules and regulations of the [Episcopal Church]. Historically, it has accepted the authority of the national church and submitted itself to the national church's jurisdiction." (*Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik, supra,* 118 Cal.App.4th at p. 929; see also *Korean United Presbyterian Church v. Presbytery of the Pacific, supra,* 230 Cal.App.3d 480 [reaching a similar conclusion regarding a different religious association based in part on § 9142 and a general church's constitutional provision comparable to Canon I.7.4].)

This conclusion is bolstered by a review of out-of-state cases that involved similar church property disputes within the Episcopal Church and that, with near unanimity, awarded the disputed property to the general church when a

local church disaffiliated itself from that general church. A typical case, and one cited in some of the later cases, is *Trinity-St. Michael's Parish, Inc. v. Episcopal Church in the Diocese of CT* (1993) 224 Conn. 797 [620 A.2d 1280]. In that case, the court reviewed the history of the Episcopal Church. It concluded that a local church that had withdrawn from the general Episcopal Church, as well as the local church's predecessors, "had agreed, as a condition to their formation as ecclesiastical organizations affiliated with the Diocese and [the Episcopal Church], to use and hold their property only for the greater purposes of the church." (*Id.*, 620 A.2d at p. 1292.) Specifically, it found that Canon I.7.4 (which it called the "Dennis Canon"), "adopted in 1979 merely codified in explicit terms a trust relationship that has been implicit in the relationship between local parishes and dioceses since the founding of [the Episcopal Church] in 1789." (620 A.2d at p. 1292.) Accordingly, it found "a legally enforceable trust in favor of the general church in the property claimed by the [local church]." (*Id.* at p. 1293.)

Other Episcopal Church cases reaching similar conclusions include *Bishop and Diocese of Colorado v. Mote* (Colo. 1986) 716 P.2d 85; *Episcopal Diocese of Massachusetts v. DeVine* (2003) 59 Mass.App.Ct. 722 [797 N.E.2d 916] (relying on Canon I.7.4 and the fact the local church had agreed to accede to the general church's canons); *Bennison v. Sharp* (1983) 121 Mich.App. 705 [329 N.W.2d 466]; *Protestant Episc. Church, Diocese of N. J. v. Graves* (1980) 83 N.J. 572 [417 A.2d 19]; *Trustees v. Trinity Church* (N.Y.App.Div. 1999) 250 A.D.2d 282 [684 N.Y.S.2d 76, 81] ("[T]he 'Dennis Canon' amendment expressly codifies a trust relationship which has implicitly existed between the local parishes and their dioceses throughout the history of the Protestant Episcopal Church," citing *Trinity-St. Michael's Parish, Inc. v. Episcopal Church in the Diocese of CT, supra,* 620 A.2d 1280); *Daniel v. Wray* (2003) 158 N.C.App. 161 [580 S.E.2d 711] (relying on Canon I.7.4); *In re Church of St. James the Less* (2005) 585 Pa. 428 [888 A.2d 795] (relying on Canon I.7.4 and citing *Trinity-St. Michael's Parish, Inc. v. Episcopal Church in the Diocese of CT, supra,* 620 A.2d 1280). The court in *Bjorkman v. Protestant Episcopal Church* (Ky. 1988) 759 S.W.2d 583 awarded the property to the local church, but there the dispute arose before the high court decision of *Jones v. Wolf, supra,* 443 U.S. 595, the opinion did not mention Canon I.7.4, and the decision has not been followed by other jurisdictions. These out-of-state decisions are not binding on this court, but we find them persuasive, especially in the aggregate.

Defendants rely in part on *Protestant Episcopal Church v. Barker, supra,* 115 Cal.App.3d 599, the only reported California case involving a property dispute within the Episcopal Church. In that case, four local churches in Los Angeles disaffiliated from the general Episcopal Church. The Court of Appeal, over a dissent, awarded the disputed property to three of the local churches and to the general church regarding the fourth local church. The

factual difference that caused the different results was that the three churches were incorporated before, and the fourth after, a particular canon of the Los Angeles Diocese was adopted. The dissent would have awarded all of the disputed property to the general church. We need not decide whether the majority decision was correct based on the specific record before it and the state of the law at the time, for it is distinguishable, largely due to the passage of time. In that case, the dispute arose and, indeed, the trial court judgment was rendered, before (1) the decision in *Jones v. Wolf, supra*, 443 U.S. 595, (2) the Episcopal Church adopted Canon I.7.4, and (3) the Legislature enacted section 9142, subdivisions (c) and (d). The appellate court in *Barker* did not mention any of the general church's canons. Accordingly, that decision does not control a dispute that, here, arose 25 years after the high court decision and the adoption of Canon I.7.4. We note that several of the out-of-state cases discussed above cite, but do not follow, *Protestant Episcopal Church v. Barker, supra*, 115 Cal.App.3d 599.[8]

Defendants also cite *California-Nevada Annual Conf. of the United Methodist Church v. St. Luke's United Methodist Church, supra*, 121 Cal.App.4th 754 (*St. Luke's*), which interpreted section 9142. The court in that case concluded that there had been a trust in favor of the general church, but that the deeds to the local property and the local church's articles of incorporation, not the general church's governing instruments, created the trust. (See *St. Luke's, supra*, at p. 770 ["The Book of Discipline [i.e., the general church's governing instrument] did not, by itself, 'create' the trust."].) Accordingly, it concluded that the local church could, and did, revoke the trust. (*Id.* at p. 771.) We need not decide whether *St. Luke's* was correct on its facts because, assuming its conclusion was factually correct, the decision is distinguishable. Here, the general church's canons, not instruments of the local church, created the trust. The language of section 9142, subdivision (d), requires any revocation of that trust to exist in the document that created it. So, assuming the local church in *St. Luke's* may have been able to revoke the trust of that case, nothing in section 9142 or the governing instruments of the Episcopal Church suggests that defendants may do so in this case.

The *St. Luke's* court also stated that "subdivision (c)(2) of Corporations Code section 9142 does not authorize a general church to create a trust interest for itself in property owned by a local church simply by issuing a rule declaring that such a trust exists . . . ." (*St. Luke's, supra*, 121 Cal.App.4th 754, 757.) As a general proposition, this statement is inconsistent

---

[8] See *Bishop and Diocese of Colorado v. Mote, supra*, 716 P.2d at pages 108–109; *id.*, footnote 17 ("[W]e find the holding in *Barker* inapplicable and decline to follow it."); *Trinity-St. Michael's Parish, Inc. v. Episcopal Church in the Diocese of CT, supra*, 620 A.2d at page 1285 ("declin[ing] to follow" *Barker*); *Episcopal Diocese of Massachusetts v. DeVine, supra*, 797 N.E.2d at page 924, footnote 21; *Bennison v. Sharp, supra*, 329 N.W.2d at pages 473–474.

with section 9142, subdivision (c)(2)'s plain language, and we disapprove it. Instead, we agree with the assessment of the Court of Appeal in this case: "[I]n a hierarchically organized church, the 'general church' *can* impress a trust on a local religious corporation of which the local corporation is a 'member' *if* the governing instruments of that superior religious body so provide."

Defendants argue that such a reading of section 9142 "would unconstitutionally promote and establish denominational religion." We need not, indeed cannot, consider all possible applications of section 9142, but as applied here, the section is fully consistent with *Jones v. Wolf, supra*, 443 U.S. at page 606, and promotes the free exercise rights of persons to form and join a religious association that is constructed and governed as they choose. Defendants also suggest that the Episcopal Church did not properly adopt Canon I.7.4 under its own rules. It is a bit late to argue that Canon I.7.4 was not effectively adopted, a quarter of a century later, and, in light of the consistent conclusions of the out-of-state cases that that canon is, indeed, part of the Episcopal Church's governing documents, the argument seems dubious at best. But, in any event, this is one of those questions regarding "religious doctrine or polity" (or, as we phrased it in *Catholic Charities of Sacramento, Inc. v. Superior Court, supra*, 32 Cal.4th at p. 541, "religious doctrine and internal church governance") on which we must defer to the greater church's resolution. (*Jones v. Wolf, supra*, 443 U.S. at p. 602.) Over the years, the Episcopal Church has consistently taken the position that Canon I.7.4 was effectively adopted.

Defendants also rely on Evidence Code section 662, which provides, "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." We need not decide how or whether this statute interacts with the more specific section 9142 (or the 1st Amendment constraints that exist in this case), because, as the Court of Appeal noted, "particularly when read in conjunction with section 9142, canon I.7.4 *is* clear and convincing evidence rebutting any presumption that the beneficial interest in the local church property is solely controlled by the local parish corporation."

Defendants state that, over the years, St. James Parish "purchased additional parcels of property in its own name, with funds donated exclusively by its members." They contend that it would be unjust and contrary to the intent of the members who, they argue, "acquired, built, improved, maintained, repaired, cared for and used the real and personal property at issue for over fifty years," to cause the local parish to "los[e] its property simply because it has changed its *spiritual* affiliation." But the matter is not so clear. We may assume that St. James Parish's members did what defendants say they did for

all this time. But they did it for a local church that was a constituent member of a greater church and that promised to remain so. Did they act over the years intending to contribute to a church that was part of the *Episcopal Church* or to contribute to St. James Parish even if it later joined a different church? It is impossible to say for sure. Probably different contributors over the years would have had different answers if they had thought about it and were asked. The only intent a secular court can effectively discern is that expressed in legally cognizable documents. In this case, those documents show that the local church agreed and intended to be part of a larger entity and to be bound by the rules and governing documents of that greater entity.

For these reasons, we agree with the Court of Appeal's conclusion (although not with all of its reasoning) that, on this record, when defendants disaffiliated from the Episcopal Church, the local church property reverted to the general church. As stated in one of the out-of-state cases involving the same Episcopal Church, "[t]he individual defendants are free to disassociate themselves from [the parish and the Episcopal Church] and to affiliate themselves with another religious denomination. No court can interfere with or control such an exercise of conscience. The problem lies in defendants' efforts to take the church property with them. This they may not do." (*Protestant Episc. Church Diocese of N. J. v. Graves, supra*, 417 A.2d at p. 25.)

### III. CONCLUSION

We affirm the judgment of the Court of Appeal.

George, C. J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I agree with the majority that the Protestant Episcopal Church in the United States of America (Episcopal Church) owns the property to which St. James Parish in Newport Beach (St. James Parish) has held title since 1950. This conclusion is compelled by Corporations Code section 9142, subdivision (c)(2). But I disagree with the majority that this provision, which applies only to religious corporations, reflects a "neutral principles of law" approach.

### I

St. James Parish began in 1946 as a mission of the Episcopal Church. In 1949, it incorporated and became a parish of the Episcopal Church. Since 1950, the parish has held the deed to the property on which the parish's church building stands. Ownership of the property is at issue here.

In 1979, the Episcopal Church added section 4 to its Canon I.7 to provide that all property held by any of its parishes is held in trust for the Episcopal Church. In 2004, St. James Parish ended its affiliation with the Episcopal Church, and it amended its articles of incorporation to delete any reference to the Episcopal Church.

Thereafter, the Episcopal Church, its Los Angeles Diocese, and a congregation member who voted against the decision of the parish to disaffiliate brought these actions, asserting that the property at issue was being held in trust for the Episcopal Church. The trial court ruled for St. James Parish; the Court of Appeal reversed. This court granted review.

## II

The First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment (*Cantwell v. Connecticut* (1940) 310 U.S. 296, 303–304 [84 L.Ed. 1213, 60 S.Ct. 900]), states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." Because of the risks of inhibiting the free development of religion and entangling secular interests in ecclesiastical concerns, the "First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." (*Presbyterian Church v. Hull Church* (1969) 393 U.S. 440, 449 [21 L.Ed.2d 658, 89 S.Ct. 601].) In this regard, the United States Supreme Court has identified two constitutionally permissible approaches that civil courts may use when called upon to resolve disputes relating to church property.

One is the "principle of government" approach: When the dispute involves a hierarchical church, as here the Episcopal Church, civil courts must accept decisions made at the highest level of the church hierarchy. (*Watson v. Jones* (1871) 80 U.S. 679, 727 [20 L.Ed. 666].)

The other is the "neutral principles of law" approach. That concept, as used in the context of a civil court's resolution of church property disputes, simply permits application of "objective, well-established concepts of trust and property law familiar to lawyers and judges." (*Jones v. Wolf* (1979) 443 U.S. 595, 603 [61 L.Ed.2d 775, 99 S.Ct. 3020].) These are "principles or rules of law 'developed for use in all property disputes' whether or not the litigants are religious associations or corporations." (*Presbytery of Riverside v. Community Church of Palm Springs* (1979) 89 Cal.App.3d 910, 923, fn. 2 [152 Cal.Rptr. 854].)

The United States Supreme Court has left it to the states to decide which approach to adopt. (*Jones v. Wolf, supra,* 443 U.S. at p. 602.)

In 1982, the California Legislature amended Corporations Code section 9142 by adding, as relevant here, subdivision (c)(2). That provision permits the assets of a religious corporation to be made subject to a trust when "the articles or bylaws of the corporation, or the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide." Thus, as the majority notes (maj. opn., *ante*, at p. 488), through legislative fiat a "superior religious body or general church" may *unilaterally* create trusts in its favor over property held by the smaller church that was a member of the general church when the trust was created. That occurred here when in 1979 the Episcopal Church added section 4 to its Canon I.7 to unilaterally provide that all property held by any parish is held in trust for the Episcopal Church.

Applying California's statute in resolving church property disputes, the majority concludes that the Episcopal Church now is the owner of the St. James Parish property in question. I agree.

But that conclusion is not based on neutral principles of law.[1] No principle of trust law exists that would allow the unilateral creation of a trust by the declaration of a nonowner of property that the owner of the property is holding it in trust for the nonowner. (*California-Nevada Annual Conf. of the United Methodist Church v. St. Luke's United Methodist Church* (2004) 121 Cal.App.4th 754, 769 [17 Cal.Rptr.3d 442].) If a neutral principle of law approach were applied here, the Episcopal Church might well lose because the 1950 deed to the disputed property is in the name of St. James Parish,[2] and the Episcopal Church's 1979 declaration that the parish was holding the property in trust for the Episcopal Church is of no legal consequence.

But under the principle of government approach, the Episcopal Church wins because that method makes the decision of the highest authority of a hierarchical church, here the Episcopal Church, binding on a civil court. This result is constitutional, but only because the dispute involves religious bodies and then only because the principle of government approach, permissible under the First Amendment, allows a state to give unbridled deference to the superior religious body or general church.

---

[1] In footnote 4, page 481, the majority asserts that neutral principles of law "include application of statutes specifically governing religious property." I disagree. In the United States Supreme Court's usage, neutral principles of law refer to laws that apply in the same way regardless of whether property is church property. (*Jones v. Wolf, supra*, 443 U.S. at p. 603 [The neutral-principles approach "relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges"].)

[2] "The owner of the legal title to property is presumed to be the owner of the full beneficial title." (Evid. Code, § 662.)

In my view, Corporations Code section 9142 reflects the principle of government approach. That statute allows a hierarchical church, such as the Episcopal Church here, through its bylaws to unilaterally impose a trust on the property of a local member parish. The statute does not state a neutral principle of law; rather, it creates a special principle applicable solely to religious corporations.

Respondents' petition for a rehearing was denied February 25, 2009, and the opinion was modified to read as printed above.