Filed 9/24/13

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SACRAMENTO SIKH SOCIETY BRADSHAW TEMPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SATNAM SINGH TATLA et al., <br><br> Defendants and Appellants. | C064277 <br><br> (Super. Ct. No. 04AS02448) |

APPEAL from a judgment of the Superior Court of Sacramento County, Alan G. Perkins, Judge.  Affirmed.

Downey Brand, Janlynn R. Fleener, Ramaah Sadasivam, Kevin McKinley and Katie Konz for Defendants and Appellants.

Donahue Blakemore & Mackey and Stephen J. Mackey; and Christopher A. Lee for Plaintiff and Respondent.

---

[*]  Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, III, IV, V, and VI of the Discussion.

Several founding members of the Sacramento Sikh Society (the Society), a nonprofit religious corporation, donated to the Society a parcel of real property in Elk Grove. The Society later obtained a second, adjacent parcel on which it erected a temple. Sometime later, other individuals took control of the Society from the founders through the election process.

The founders and others took various steps to gain control of the Society's real property, including recording two transfer deeds purportedly from the Society to some of them. When the Society learned of this conduct, it initiated this action for slander of title against those purportedly responsible, to wit, defendants Satnam Tatla, Vichitra Sandhu, Kehar Singh, Kamal Gill, Gian Gill, Harinder Singh, Hakam Singh, Avtar Dosanjh, Sarban Singh, Mohinder Dosanjh, Manjit Dosanjh (the named defendants). Some of the named defendants in turn filed a cross-complaint against the Society and those who were running it.

Resolution of this dispute turned in part on whether bylaws adopted for the Society in 1996 superseded those adopted earlier. The named defendants claimed they remained in control of the Society by virtue of the earlier bylaws and, therefore, retained the power to transfer the two parcels. In a bench trial, the court concluded otherwise and nullified the two transfer deeds. The court also rejected the named defendants' claim that they are "life members" of the Society and, because they otherwise failed to maintain membership in the Society, the court concluded the named defendants have no standing to pursue their cross-complaint. In a subsequent proceeding, a jury found against all of the named defendants except Gian Gill and Manjit Dosanjh on the Society's claim for slander of title and awarded both consequential and punitive damages.

Satnam Tatla, Vichitra Sandhu, Kehar Singh, Kamal Gill, Gian Gill, Harinder Singh, Hakam Singh and Avtar Dosanjh (hereafter collectively defendants) appeal, challenging the judgment and each of the foregoing determinations. They contend the trial court erred in concluding the 1996 bylaws were properly adopted, setting aside the

2

two grant deeds, and finding that they lack standing to pursue their cross-complaint. They also contend there is insufficient evidence to support the jury's verdict on the slander of title claim, the jury was not properly instructed on the punitive damages issue, and there is insufficient evidence to support the punitive damages award.

We reject each of defendants' contentions and affirm the judgment.

FACTS AND PROCEEDINGS

Because defendants raise various challenges to the sufficiency of the evidence, we recount the evidence in the light most favorable to the judgment below. (*Bunch v. Hoffinger Industries, Inc.* (2004) 123 Cal.App.4th 1278, 1303.)

In October 1988, Kamal S. Gill, Vichitra Singh Sandhu, Kehar Singh Shonky and Avtar Singh Dosanjh filed articles of incorporation with the California Secretary of State for the Society, a nonprofit religious organization. In early 1989, a Statement by Domestic Nonprofit Corporation was filed for the Society, listing as officers Vichitra Sandhu (chief executive officer), Kehar Singh (secretary), and Avtar Dosanjh (chief financial officer). The principal office of the Society was listed as 5600 Lerner Way in Sacramento, which was a home owned by Vichitra Sandhu.

In December 1989, Kamal Gill, Avtar Dosanjh and Vichitra Sandhu donated to the Society a 13-acre parcel of property on Gerber Road in Elk Grove for the express purpose of building and maintaining a "Sikh Gurdwara" (temple) and associated facilities.

In October 1992, the board of directors of the Society adopted the first restated bylaws (the 1992 bylaws) to govern the Society. The 1992 bylaws provided that the Society would be governed by a board of directors, whose members would be elected by the "Voting Members." The 1992 bylaws established a maximum of 100 "Voting Members," all of whom must be approved by the board and who alone may be selected as directors. The board in turn would select the officers of the Society.

3

In 1993, the officers of the Society were Kamal Gill (chief executive officer), Makham Singh (secretary), and Avtar Dosanjh (chief financial officer).

The Society later discovered it could not build a temple on the 13-acre parcel. It purchased an adjacent, 10-acre parcel fronting on Bradshaw Road that contained an old house and garage. The official address of the Society was moved to this Bradshaw Road location. Because the Society could not obtain a loan for the purchase in its own name, the property was placed in the names of Kamal and Gian Gill, Jaswant and Mohinder Hundal, Mohinder and Manjit Dosanjh, and Vichitra Sandhu. After the mortgage was paid off, those individuals signed a grant deed transferring the property to the Society.

In 1995, a dispute arose over governance of the Society. On April 17, 1995, the Society, Makham Singh, Kamal Gill, Darshan Dhaliwal, Jaswant Hundal, and Amrik Kaile filed suit in Sacramento County Superior Court against Vichitra Sandhu, Avtar Dosanjh, Tara Ratenda, Ajit Randhawa, Pargan Bains, Rulda Shekhon, Ajit Grewal, Ranjit Singh, Balwant Virk, Gurbux Singh, Gurdee Singh, Sewa Singh, Pilem Mandi, and Sarwan Mathwalu for declaratory relief, an injunction and an accounting. The complaint alleged the plaintiffs are all member-directors of the Society or otherwise persons who have contributed time, money and/or personal property to the Society and the defendants "were or are purported member-directors of the Society and/or have taken control of the books, records, and assets of the Society . . . ." It further alleged the defendants had "improperly dealt with assets of the Society" in violation of the bylaws, had deprived plaintiffs of access to the books, records, minutes, membership lists, and receipt books of the Society, and had improperly acted as officers and directors of the Society.

A receiver was appointed to run the Society during the pendency of this litigation. In 1996, at the behest of the Society's congregation, the Council of Five, or Punj Pyara, of the Society approached the parties to the litigation about settling the matter.

On July 10, 1996, in open court, the parties to the pending action entered into a stipulation for settlement. The settlement provided that "[a]ll of the matters that have

4

been placed at issue as a result of this combined litigation shall be ultimately in the domain and be resolved by the [Punj Pyara] selected by the congregation of the [Society]." The settlement also created two advisory committees: an audit committee and a bylaws committee. The audit committee was tasked with investigating alleged financial irregularities within the Society and reporting to the congregation. The function of the bylaws committee was "to make recommendations relating to what type of guidelines would be appropriate and what type of language, if this temple ultimately modifies its by-laws, would be appropriate in those by-laws." The settlement further provided that any recommendations of the bylaw committee "may or may not be dealt with directly by the [Punj Pyara]."

Not all parties to the litigation were present in court the day the settlement agreement was announced. The agreement provided that counsel for the parties would undertake to obtain signatures on the settlement agreement for those not present and the court would retain jurisdiction to effectuate the settlement. However, signatures were not obtained from all the parties to the litigation. Nevertheless, on September 5, 1996, the trial court dismissed the action.

New bylaws for the Society were prepared pursuant to the settlement agreement (the 1996 bylaws) and were approved by the Punj Pyara. They were thereafter adopted at a meeting of the congregation by a show of hands.

Several of the defendants in the present matter, some of whom had been involved in the Society since its inception, ceased attending services at the Society's Bradshaw Road location after resolution of the 1995-1996 litigation. One defendant, Satnam Tatla, who lived more than 40 miles away from the Bradshaw Road facility, discontinued attendance even before the lawsuit was filed.

A 15-member board of directors was elected by the Society pursuant to the 1996 bylaws. Another board election was held in 1999-2000, also pursuant to the 1996 bylaws.

5

Construction of a temple on the Bradshaw Road property was completed in 1999.

In 2002, a new dispute arose over failure of the Society to hold a board election. Suit was filed based on the election provisions of the 1996 bylaws and the court ordered an election for June 2002. However, because of violence that erupted over eligibility to vote, the election did not occur as scheduled. The court ordered a new registration period for membership between November and December 2002 and a new election for January 5, 2003. All those who signed up to vote agreed to be bound by the 1996 bylaws.

Two of the named defendants, Hakam Singh and Mohinder Dosanjh, were on the ballot for the January 2003 election. All of the named defendants except Tatla and Avtar Dosanjh signed up to vote and voted in the election.

Neither Hakam Singh nor Mohinder Dosanjh was elected to the Society's board of directors.

After the 2003 election, the original defendants began meeting at the Lerner Way address to devise a scheme for reclaiming the two parcels of real property held by the Society. Around this same time, they allegedly discovered a letter purportedly written in 1997 by Morey Fuqua, attorney for the defendants in the 1995-1996 litigation. In that letter, Fuqua opined the 1996 bylaws are of no legal effect because the 1996 settlement agreement was never fully executed. Fuqua indicated a "tentative" settlement was reached in open court that was later signed by all the defendants but not all the plaintiffs. According to Fuqua: "Because the tentative Settlement Agreement negotiated in open court was never signed by the plaintiffs, the Court, on September 5, 1996, dismissed the litigation." Fuqua opined that this dismissal placed the Society back in the same position it had been in before the lawsuit was filed, i.e., under the governance of the 1992 bylaws. And, since the 1996 bylaws were not adopted pursuant to the terms of the 1992 bylaws, they never came into legal effect.

The named defendants declared themselves to be the true representatives of the Society and elected Tatla to serve as their president. Tatla, acting as president of the

6

Society, later signed grant deeds transferring ownership of one of the parcels to Vichitra Sandhu, Kamal Gill, Gian Gill, Mohinder Dosanjh and Manjit Dosanjh, and the other parcel to Vichitra Sandhu, Kamal Gill and Avtar Dosanjh. Tatla gave the grant deeds to Hakam Singh, who filed them in the county recorder's office.

The named defendants then hired attorney Richard Corbin to file a quiet title action on the two parcels. Suit was filed, naming as the sole defendant Bhagat Singh, who was purportedly residing on the premises at the time. A default judgment was eventually obtained against Singh.

Thereafter, the named defendants sent letters to the IRS and the Franchise Tax Board claiming to be in charge of the Society. In 2004, the Society received notice that SMUD was about to turn off power at the Bradshaw Road facility. They investigated and discovered a document in the county building department dated May 10, 2004, asserting that there had been unauthorized construction on the Bradshaw Road site. The letter was signed by Vichitra Sandhu and claimed the property was owned by those to whom it had purportedly been transferred by Tatla. Around this same time, the Society also discovered the two deeds executed by Tatla.

The foregoing actions of the named defendants placed a cloud on the title of the two Society parcels and delayed efforts by the Society to construct a new temple. The Society also incurred substantial legal fees in attempting to establish its title to the real property and had difficulty raising funds for the construction project.

On June 17, 2004, the Society filed suit against the named defendants for slander of title. In November, all the named defendants except Sarban Singh and Hakam Singh, filed a cross-complaint against the Society, Balwant Virk, Amrik Kaile, Kashmira Atwal, Amarjit Bassi, and Surinder Dhadda for breach of fiduciary duty, breach of the covenant of quiet enjoyment, declaratory relief, accounting and conversion.

The trial court bifurcated the issues for trial. Following a bench trial, the court concluded the settlement agreement reached in the 1996 litigation was effective and the

7

1996 bylaws, adopted pursuant to that agreement, governed the Society thereafter. Consequently, the election that occurred in January 2003 pursuant to the 1996 bylaws was valid and the named defendants had no authority to transfer ownership of the two parcels. The court therefore nullified the 2004 grant deeds executed by Tatla. The court also rejected the named defendants' claim that they are life members of the Society and, therefore, concluded they have no standing to pursue their cross-complaint.

In a subsequent proceeding, a jury found against all of the named defendants except Manjit Dosanjh and Gian Gill on the Society's claim for slander of title. The jury concluded those defendants acted with malice in their dealings with the Society's property and awarded damages in the amount of $359,021.22. The jury also awarded punitive damages in various amounts from $60,000 to $167,500 against each of those defendants.

DISCUSSION

I

*The Operative Bylaws*

Defendants contend the trial court erred in concluding the 1996 bylaws were properly adopted and supersede the 1992 bylaws as the governing document for the Society. As explained hereafter, that finding is the foundation for most of the conclusions reached by the court and the jury in this matter.

Defendants acknowledge the trial court concluded the 1996 settlement placed authority in the Punj Pyara to prepare new bylaws and those bylaws were later approved by a show of hands of the congregation. However, defendants argue, the 1996 settlement was not effective because it was not signed by all the parties to the 1995 litigation. Further, they argue, the 1992 bylaws contained specific provisions for amendment, and those provisions were not followed in adopting the 1996 bylaws. Hence, according to defendants, the 1992 bylaws continue to govern the Society.

8

The fact that not all the parties to the 1995 litigation signed the settlement agreement or were present in court at the time the settlement agreement was announced, as defendants assert, does not mean it was not an enforceable agreement. Code of Civil Procedure section 664.6 is an expedited procedure for enforcement of settlements. It requires the signature or presence by all the parties. (See *Levy v. Superior Court* (1995) 10 Cal.4th 578, 585-586.) However, that does not mean a settlement agreement by fewer than all the parties is not otherwise enforceable. "The statutory procedure for enforcing settlement agreements under [Code of Civil Procedure] section 664.6 is not exclusive. It is merely an expeditious, valid alternative statutorily created. [Citation.] Settlement agreements may also be enforced by motion for summary judgment, by a separate suit in equity or by amendment of the pleadings to raise the settlement as an affirmative defense. Settlement agreements not enforceable under Code of Civil Procedure section 664.6 are governed by the legal principles applicable to contracts in general." (*Nicholson v. Barab* (1991) 233 Cal.App.3d 1671, 1681.)

Under general principles of law, an agreement entered into by a party's attorney of record is enforceable against that party, although not by way of Code of Civil Procedure section 664.6. (See *Levy v. Superior Court*, *supra*, 10 Cal.4th at p. 587 (dis. opn. of Werdeger, J.).) In this instance, the settlement agreement was executed by the Society, through its attorney of record, as well as most of the other parties. Furthermore, even as to the absent parties, the settlement was agreed to by their attorneys of record.

Defendants nevertheless argue the directors of the Society, who were the parties to the 1995 litigation, had no authority to enter into the settlement agreement on behalf of the Society because the Society was being run, at the time, by a receiver. However, that argument proves too much. Defendants assert the receiver essentially displaced the board in the management of the Society. But, taken to its logical conclusion, that would mean the receiver could, unilaterally, amend the bylaws of the Society. In other words, the receiver could have done anything the Society's directors could do. Obviously, the

9

receiver did not have such power. The power to run the day-to-day operations of the Society is not the same as the power to govern the Society. Furthermore, to the extent the receiver had such expansive powers, the receiver's authorized agent, the attorney for the Society, agreed to the settlement on behalf of the Society.

Defendants argue there was no settlement agreement reached in July 1996 but only a settlement "in principle." Thus, they argue, there was never an enforceable agreement. However, this is belied by the terms of the court's minute order, which states that "[t]he matter was agreed to orally and put on the record as stipulated." The terms of that agreement are then set forth in the order. This was not merely an agreement to agree, as defendants suggest.

Defendants contend "it is beyond dispute" that the Society's board never consented to the settlement agreement. However, as support, defendants cite nothing more than the Fuqua letter purportedly written in 1997, in which the attorney for the defendants in the 1995 litigation asserted that while all of the defendants in that action signed the settlement agreement, not all of the plaintiffs did so. The Fuqua letter is hearsay and its authenticity was never established by defendants at trial. Furthermore, the fact that one or more of the plaintiffs in the 1995 action did not sign the settlement agreement, as defendants assert, does not prove the board of the Society did not approve it. The complaint in the 1995 action alleged the parties were directors of the Society or persons otherwise involved in the affairs of the Society. At least the majority of those parties agreed to the settlement. Based on the record before us, we cannot say those who agreed to the settlement did not encompass the board as a whole.

Defendants nevertheless argue that, even if there was an enforceable agreement and it gave power to the Punj Pyara to prepare amended bylaws, that did not include a power to *approve* the amended bylaws unilaterally. However, assuming that is true, the evidence presented at trial established that the 1996 bylaws were ultimately approved by the congregation.

10

Defendants argue such approval by the congregation was ineffective, because the 1992 bylaws contained their own rules for amendment, and those rules were not followed. Article XIV, section 1 of the 1992 bylaws reads: "New bylaws may be adopted or these Bylaws may be amended or repealed by approval of the Voting Members at a meeting of the Voting Members following any action by the Board in which these Bylaws were amended or other [*sic*] changed." Article XIV, section 2, in turn provides: "Subject to the right of the Voting Members under Section 1 of this ARTICLE, these Bylaws, other than a bylaw fixing or changing the authorized number of the directors, may be adopted, amended or repealed by the Board. . . ." Defendants assert the 1996 bylaws were neither adopted by the board in existence at the time nor approved by the "Voting Members," who were limited to 100 individuals.

The problem with defendants' argument is that it essentially vitiates the 1995 litigation and the 1996 settlement agreement. The 1995 litigation was filed because of problems regarding the governance of the Society. The litigation was apparently filed by one group of directors against another group of directors and others. Prior to that litigation, the parties already had the power to amend the 1992 bylaws according to their terms. Defendants' argument assumes that, as a result of the 1995 litigation and the settlement reached, the parties were still required to follow the terms of the 1992 bylaws in order to amend them. In other words, according to defendants, even if the 1996 settlement agreement was properly executed, that settlement agreement had no legal effect. This cannot possibly be what the parties to the settlement agreement intended when they gave power to the Punj Pyara to deal with any recommendations on bylaws changes made by the bylaws committee.

Furthermore, the trial court interpreted Article XIV of the 1992 bylaws as granting the voting members the power to override a decision of the board to amend the bylaws. However, the voting members are not required to exercise that power, and did not do so in this instance.

11

We agree with this interpretation. As noted above, section 1 of Article XIV of the 1992 bylaws provided that the bylaws "may be" amended by the voting members "following any action by the Board" to amend them. Section 2 in turn provided that, subject to the foregoing "right of the Voting Members," the bylaws may be amended by the board. Read together, these sections provide that the board may amend the bylaws subject to a right in the voting members to reject such amendment.

Defendants argue that the fact the voting members failed to reject the 1996 bylaws is significant only if those bylaws were first properly adopted by the board pursuant to the 1992 bylaws. However, this argument again assumes the 1996 settlement agreement had no force or effect and the Society remained subject to the 1992 bylaws as if the 1995 litigation had never occurred. However, the trial court correctly concluded the settlement agreement transferred authority to amend the bylaws from the board to the Punj Pyara.

Defendants argue the fact that the voting members did not override the adoption of the 1996 bylaws by the Punj Pyara is of no import, because the voting members had no opportunity to object. According to defendants, the voting members had been "disenfranchised" by the Punj Pyara and many of them had been banned from the premises and were "living in fear" of the Punj Pyara. However, defendants cite nothing to support their claim of disenfranchisement, and their assertion that many voting members were banned and living in fear is supported only by a statement in their trial brief, which itself does not cite any actual evidence.

Defendants nevertheless argue the voting members did object to the 1996 bylaws by way of the 1997 Fuqua letter. However, even assuming the authenticity of that letter, it does not amount to an objection by the voting members but only a legal opinion by a single attorney.

Defendants contend the 1996 settlement agreement could not effectively grant power to the Punj Pyara to amend the bylaws. They cite as support Corporations Code section 9210 (unspecified section references that follow are to this code), which reads:

12

"Subject to the provisions of this part and any provision in the articles or bylaws: [¶] (a) Each corporation shall have a board of directors. The activities and affairs of a corporation shall be conducted and all corporate powers shall be exercised by or under the direction of the board. [¶] (b) The board may delegate the management of the activities of the corporation to any person or persons provided that the activities and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the board." Defendants argue the settlement agreement was invalid because it contained no provision for oversight of the Punj Pyara by the board.

Accepting defendants' argument would mean the trial court in the 1995 action was powerless to provide relief to the parties. As explained earlier, that dispute was among the directors of the Society over governance. Obviously, the directors could not work out their differences on their own and sought the assistance of the court. The settlement agreement transferred power over amendment of the bylaws from the board to the Punj Pyara in order to clear that logjam.

Furthermore, and more importantly, the fact that the settlement agreement might have provided relief that violated section 9210 has no bearing on this matter. There is nothing in the record to suggest any of the parties objected to the settlement agreement on that basis. Since no party appealed the decision of the court approving the settlement agreement in 1996, any error in the settlement agreement and order thereon has been forfeited.

The same goes for defendants' argument that adoption of the 1996 bylaws violated sections 9150 and 9151. Section 9150, subdivision (c), reads: "Subject to any provision in the articles or bylaws, the power of the board to adopt, amend or repeal bylaws is subject to the powers of members set forth in Section 9151." Section 9151, subdivision (b), in turn provides: "Except as otherwise provided in the articles or bylaws, once members have been admitted, a bylaw specifying or changing a fixed number of directors

or the maximum or minimum number or changing from a fixed to a variable board or vice versa may only be adopted by approval of the members . . . ." Defendants argue the 1996 bylaws changed the number of directors from 13 to 11 but, because the 1992 bylaws contained their own rules for changing the number of directors, it controlled. According to defendants, the 1992 bylaws required a vote of the voting members in order to change the number of directors. But, here again, the settlement agreement transferred to the Punj Pyara the power to change the bylaws and any claim now that this violated sections 9150 and 9151 has been forfeited.

Defendants cite *Concord Christian Center v. Open Bible Standard Churches* (2005) 132 Cal.App.4th 1396, at page 1417, for the proposition that "the church leadership was 'not entitled, simply by majority vote at an unnoticed meeting of the handpicked membership, to override the mandatory provisions . . . found in the national church's constitution and bylaws.' " According to defendants, "[t]hat is precisely what occurred here."

Defendants are mistaken. The meeting of the congregation to approve the 1996 bylaws was preceded by notice, and there is nothing in the record to suggest the voters were handpicked by the Punj Pyara. Furthermore, as explained above, the settlement agreement specifically overrode the provisions in the 1992 bylaws on the process for making amendments.

Based on the totality of the evidence presented at trial, we conclude substantial evidence supports the trial court's conclusion that the 1996 bylaws supplanted the 1992 bylaws by virtue of the 1996 settlement agreement and the actions of the Punj Pyara and the congregation thereafter.

## II

### *Standing*

Defendants contend the trial court erred in concluding they lack standing to pursue their cross-complaint. That cross-complaint contains a claim for declaratory relief in which defendants, as cross-complainants, contend the cross-defendants have improperly assumed control of the Society and its assets and have attempted to adopt new bylaws in derogation of the 1992 bylaws. The cross-complaint also contains a claim that the cross-defendants have breached their fiduciary duty by taking control of the Society, a claim for an accounting of Society funds allegedly misappropriated by the cross-defendants, a claim for breach of the covenant of quiet enjoyment of the Society's real property, and a claim for conversion of the Society's assets.

It is undisputed that defendants failed to maintain membership in the Society within the terms of the 1996 bylaws. Defendants claim they were life members by virtue of having contributed property and services to the Society and being its founders. The trial court concluded defendants failed to prove they are life members of the Society. Hence, according to the court, defendants lack standing to assert claims against the cross-defendants on behalf of the Society.

Defendants contend on appeal that, by so ruling, the trial court crossed the line between resolving property disputes and resolving ecclesiastical issues reserved to the church under the First Amendment to the United States Constitution. According to defendants, the question of who is and who is not a member of a religious organization impacts matters of religious freedom and is reserved to the organization itself. Defendants argue the determination of their membership status with the Society "was based on the informal traditions, customs, and practices of the organization," which is "precisely the sort of sectarian dispute over membership that the courts of this State are precluded from deciding."

In *Episcopal Church Cases* (2009) 45 Cal.4th 467, the California Supreme Court described the following principles for adjudicating disputes within a religious organization: "The high court has approved two methods for adjudicating church property disputes. The first approach is one the court itself adopted in the 19th century. (*Watson v. Jones* [(1871) 80 U.S. 679 [20 L.Ed. 666]].) This approach is often called the 'principle of government' approach. [Citation.] The *Watson v. Jones* court distinguished between two types of church disputes. One 'has reference to the case of a church of a strictly congregational or independent organization, governed solely within itself . . .; and to property held by such a church, either by way of purchase or donation, with no other specific trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society.' [Citation.] 'In such cases,' the court explained, 'where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations.' [Citation.] Another type, which the court said 'is the one which is oftenest found in the courts,' involves a hierarchical structure, i.e., a 'religious congregation which is itself part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government.' [Citation.] In the latter case, the court said, 'we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments.' [Citation.]" (*Episcopal Church Cases*, *supra*, at p. 480; fn. omitted.)

In *Korean United Presbyterian Church v. Presbytery of the Pacific* (1991) 230 Cal.App.3d 480 (*Korean United*), disapproved on other grounds in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743 and footnote 11, Reverend Woo persuaded a majority of the local church that they should leave the denomination and the higher authority of the denomination responded by appointing new leaders for the local church.

16

This higher authority then determined that the minority of the local church, represented by the denomination's self-appointed leaders, represented the true church and was entitled to control the local church's property. (*Korean United,* at pp. 487, 494.) The trial court entered judgment for Reverend Woo and the majority, thereby giving them control of the property.

The Court of Appeal reversed. Among other things, the appellate court concluded the trial court's decision violated the First Amendment by substituting the court's judgment for that of the church hierarchy regarding the identity of the local church. According to the court, the question of which group is the "true" church is " 'clearly ecclesiastical' " and, therefore, the ecclesiastical authorities' determination on the issue is controlling. (*Korean United*, *supra*, 230 Cal.App.3d at p. 501; see *id.* at pp. 500-503; accord, *Metropolitan Philip v. Steiger* (2000) 82 Cal.App.4th 923, 930-931.)

The present matter does not involve a church hierarchical structure and a dispute between the local authorities and a higher authority. It instead involves the first situation identified in *Episcopal Church Cases*--a dispute among factions in an independent organization. There is nothing in this record to suggest the Society is part of some larger organization. The dispute must therefore be determined by " 'the ordinary principles which govern voluntary associations.' " (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 480.) In other words, the dispute must be resolved without reference to ecclesiastical principles. If this cannot be done, the issue is not properly before the courts.

Defendants contend issues of membership are strictly within the purview of church authorities. They cite as support *New v. Kroger* (2008) 167 Cal.App.4th 800, at page 815, where the court said: "The prohibition against civil court participation in sectarian disputes extends to issues involving membership, clergy credentials and discipline, as well as religious entity governance and administration." They also cite *Iglesia Evangelica Latina, Inc. v. Southern Pacific Latin American Dist. of Assemblies of God* (2009) 173 Cal.App.4th 420, at page 437, where the court asserted " 'ecclesiastical

17

matters include not only issues of religious doctrine per se, but also issues of membership, clergy credentials and discipline, and church polity and administration.' "

The fact that issues of church membership may fall within the purview of church authorities does not mean that is always the case. The question is whether resolution of the membership issue requires reference to church doctrine rather than neutral legal principles. In *New v. Kroger*, despite indicating issues of membership fall outside the scope of court authority, the court went on to rule that certain parties who had resigned their membership in the church were no longer empowered to act on behalf of the church. (*New v. Kroger*, *supra*, 167 Cal.App.4th at p. 822.) In effect, the court ruled that the individuals in question were no longer members because they had resigned. That ruling was based on basic legal principles rather than church doctrine.

In the present matter, the issue presented to the trial court was whether defendants were life members of the Society. They assert their membership status "was based on the informal traditions, customs, and practices of the [Society]."

We disagree. There was no evidence presented at trial that life membership was a status conferred on members of the congregation due to ecclesiastical matters. Rather, defendants' claim of life membership was simply one of fact based on evidence as to whether the Society as a whole recognized that status and, if so, whether it had been conferred on defendants. This was no more an ecclesiastical matter than the question whether certain parties in *New v. Kroger* had resigned their membership. A trial court is well equipped to resolve such factual disputes.

Although there was evidence presented by defendants by way of their own testimony that they had been made life members, there was no evidence the Society even recognized such status. Neither the 1992 bylaws nor any other governing document contained any provision for life membership. Defendants could provide no documentation to that effect. Thus, based on the evidence as a whole, the trial court's

18

determination that defendants failed to prove they were life members is supported by substantial evidence.

Defendants nevertheless contend they have standing to pursue their cross-complaint because, as voting members and directors of the Society under the 1992 bylaws, they have a beneficial interest in the outcome of the claims. However, to the extent the claims in the cross-complaint are premised on the continued validity of the 1992 bylaws, those claims are without merit and any error by the trial court in finding a lack of standing was harmless. As for any other claims in the cross-complaint, these were claims on behalf of the Society. Since defendants are not members of the Society, they have no standing to pursue such claims.

Finally, defendants contend they have standing under section 9418 to pursue claims relating to the validity of the 2003 election. Subdivision (a) of that section reads: "Upon the filing of an action therefor by any director or member, or by any person who had the right to vote in the election at issue after such director, member, or person has exhausted any remedies provided in the articles or bylaws, the superior court of the proper county shall determine the validity of any election or appointment of any director of any corporation." Defendants again contend that, because the 1996 bylaws were invalid, the 1992 bylaws control and, under those bylaws, they are directors and voting members of the Society. However, as previously explained, because defendants are wrong about the continued validity of the 1992 bylaws, their claim of director and voting member status is without merit. And although at least some of defendants signed up for membership in 2003 and participated in the January 2003 vote, that 2003 membership lapsed before this case was filed.

19

## III

### *Validity of 2004 Deeds*

The trial court concluded the two grant deeds were improper for three separate and independent reasons:  (1) failure to comply with sections 9630 to 9633; (2) lack of power in defendants to make the transfers because the 1992 bylaws were superseded by the 1996 bylaws; and (3) self-dealing.  Defendants contend the court erred as to each.

As previously explained, the trial court did not err in concluding the 1996 bylaws supplanted the 1992 bylaws as the governing document for the Society.  Hence, the second basis for the court's conclusion was sound.  And while we need not consider the other bases for the court's conclusion, we shall do so briefly for the sake of completeness.

Under section 9631, a nonprofit corporation may dispose of "all or substantially all of its assets" when approved by the board and, unless in the ordinary course of business, approved by the members.  (§ 9631, subd. (a).)  Section 9633 provides:  "A corporation must give written notice to the Attorney General 20 days before it sells, leases, conveys, exchanges, transfers or otherwise disposes of all or substantially all of its assets . . . ."

It is undisputed the 2004 deeds were not approved by either the board or the members of the Society and notice was not given to the Attorney General.  Defendants nevertheless contend the Society failed to prove the transfers of the two parcels of real property constituted a transfer of all or substantially all of its assets and, hence, that the transfers were subject to the foregoing provisions.  However, as the trial court concluded, there was no dispute that the two parcels constituted all or substantially all of the assets of the Society.  There was no evidence presented of any other meaningful assets held by the Society, and no argument was raised by defendants at trial to the contrary.  Thus, the trial court could properly find the issue was undisputed.

20

On the issue of self-dealing, section 9243 provides for remedies in the case of a transaction in which a religious corporation is a party "and in which one or more of its directors has a material financial interest." (§ 9243, subd. (a).) There are, however, several exceptions, including where:

"(A) The corporation entered into the transaction for its own benefit or the benefit of the religious organization;

"(B) The transaction was fair and reasonable as to the corporation or was in furtherance of its religious purposes at the time the corporation entered into the transaction;

"(C) Prior to consummating the transaction . . ., the board authorized or approved the transaction in good faith by a vote of a majority of the directors then in office without counting the vote of the interested director or directors, and with knowledge of the material facts concerning the transaction and the director's interest in the transaction. . .; and

"(D) (i)  Prior to authorizing or approving the transaction, the board considered and in good faith determined after reasonable investigation under the circumstances that either the corporation could not have obtained a more advantageous arrangement with reasonable effort under the circumstances or the transaction was in furtherance of the corporation's religious purposes or (ii) in fact, either the corporation could not have obtained a more advantageous arrangement with reasonable effort under the circumstances or the transaction was in furtherance of the corporation's religious purposes." (§ 9243, subd. (d)(3).)

Defendants contend the foregoing exception applies here.  They argue "[t]he evidence presented in the trial court demonstrates that the property transfers were permissible under Corporations Code section 9243[, subdivision] (d)(3) because [defendants] were attempting to reclaim property from the Punj Pyare [*sic*], a militant group that had forcibly occupied the Sacramento Sikh Society and unlawfully taken over

21

the organization." Defendants further argue their use of the 2004 deeds "was done in pursuit of the Specific Purpose in the 1992 Bylaws . . . and to protect the Society from the unwelcome and improper radicalization of the corporation by the Punj Pyare [*sic*]." Finally, defendants contend the 2004 transfers "were authorized by a majority vote of the Board of Directors in office pursuant to the 1992 Bylaws . . . ."

It is readily obvious defendants' arguments are based on a self-serving view of the evidence presented to the trial court. However, on appeal from a judgment on the merits, we view the evidence in the light most favorable to the judgment. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

Although defendants certainly claimed in their testimony that the Punj Pyara had taken control of the Society through violence and intimidation, other evidence presented to the trial court established that the Punj Pyara was given control of the Society in 1996 pursuant to agreement of the parties and at the instigation of the congregation as a whole, the Punj Pyara adopted new bylaws, the congregation approved the new bylaws, and several elections for the board were held thereafter pursuant to the new bylaws. There is no indication the Punj Pyara had any further involvement in the operation of the Society after the election of the first new directors. When viewed in the light most favorable to the judgment, the evidence shows the property was being held by those in charge of the Society in furtherance of the wishes of the congregation as a whole. Hence, the trial court could reasonably have concluded the 2004 deeds were not fair and reasonable or in furtherance of the Society's purposes. (See § 9243, subd. (d)(3)(B).)

And even if we assume the 1996 bylaws were not valid, and thus the directors elected pursuant to the 1992 bylaws were still in charge of the Society, defendants do not show how return of the two parcels to the original donors would have benefited the Society. On the contrary, those transfers would have benefited those to whom the property was transferred, who obtained improved property, at the expense of the Society as a whole. And while two of the defendants testified that the group planned to give the

22

property back to the Society after they regained control, this self-serving testimony could reasonably have been discounted by the trial court and, in any event, only established that the transaction was neither beneficial nor detrimental to the Society. Furthermore, under defendants' theory, they were already in charge of the Society and thus had no reason to transfer the property to themselves. The trial court's finding that the 2004 deeds amounted to self-dealing is therefore supported by substantial evidence.

IV

*Slander of Title*

Defendants contend that, if we conclude the trial court erred in determining the 1996 bylaws supplanted the 1992 bylaws, the basis for concluding the 2004 deeds were invalid would disappear. Hence, the jury's subsequent verdict against them for slander of title must be reversed. However, because we conclude the trial court did not err, we reject this argument.

Defendants also contend there is no substantial evidence to support the jury's verdict on the slander of title claim. According to defendants: "The substantial evidence introduced at the trial below shows that, at [the] time they created and recorded the two deeds to transfer the Society's real property back to the original donors, [defendants] believed that the 1992 Bylaws were never superseded by the 1996 Bylaws." Thus, defendants argue, they genuinely believed they were acting on behalf of the Society under the 1992 bylaws and could not have been acting with malice, as required for a slander of title claim.

Despite defendants' assertion that there is insufficient evidence to support the verdict, their arguments in support misperceive the applicable standard of review. The question here is not whether substantial evidence supports a finding that defendants believed the 1992 bylaws were operative and their transfer of the property was lawful but whether substantial evidence supports the opposite conclusion. As noted earlier, we

23

review the evidence in the light most favorable to the judgment and determine whether the evidence is sufficient to support that judgment. It is possible that substantial evidence supports both a finding that the 1992 bylaws remained operative and the opposite finding that they did not. In such case, the issue is for the finder of fact to decide.

"Slander of title is the false and unprivileged disparagement of title to real property resulting in pecuniary damage. [Citation.] The recording of a deed which casts doubt upon the title is basis for an action in slander of title." (*Cavin Memorial Corp. v. Requa* (1970) 5 Cal.App.3d 345, 361) The elements of a claim for slander of title are "(1) a publication, (2) without privilege or justification, (3) falsity, and (4) direct pecuniary loss." (*Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1030.) In addition, a claim for slander of title will not lie in the absence of malice, either express or implied. (*Gudger v. Manton* (1943) 21 Cal.2d 537, 544, disapproved on other grounds in *Albertson v. Raboff* (1956) 46 Cal.2d 375, 381.)

Defendants contend the elements of lack of privilege or justification and malice are absent here. They assert substantial evidence shows that, at the time the two deeds were created and recorded, they believed the 1992 bylaws were still controlling. Therefore, they considered themselves to be the authorized leaders of the Society with the power to handle its day-to-day operations, including the transfer of Society property. According to defendants, they transferred the property in order to protect it from the Punj Pyara.

Assuming defendants are correct that substantial evidence supports a finding that they believed the 1992 bylaws were still in effect and they transferred the property in order to protect it from the Punj Pyara, there is substantial evidence to the contrary as well. For example, despite defendants' assertion that they believed the 1992 bylaws were still in effect, they proceeded for years after adoption of the 1996 bylaws as if those later bylaws were controlling. It was not until 2003, after defendants were unsuccessful in

24

regaining control of the Society through the election process, that they purportedly discovered the 1997 Fuqua letter and chose a different course of action.

Tatla testified that, when defendants began meeting at Lerner Way after the election, they immediately discussed embarking on a plan to get the property back from the people then in charge of the Society. Avtar Dosanjh testified that the purpose of the meetings at Lerner Way was to take back the property from the Society and give it to the original donors. Maahan Singh testified that, at those meetings, the participants put together a plan to get the property back to the original temple members. There is no mention here of taking control of the property for the sake of the Society.

Defendants' assertion that they first learned they were still in charge of the Society after discovering the Fuqua letter is belied by the nature of their actions. One of defendants' first acts was to file a quiet title action on the property. However, rather than name as the defendants in that action all those who might have a claim on the property, defendants chose to name as the sole defendant an individual who was purportedly living at the temple but had no such claim. Defendants did not name as defendants the obvious parties, i.e., those claiming to represent the Society by virtue of the 2003 election. It may reasonably be concluded from this that defendants did not want those claiming to represent the Society to discover the quiet title action and defend against it by asserting their superior claims on the property. These are not the normal actions of a party who believes he has a legitimate claim to real property.

Furthermore, if defendants truly believed the 1992 bylaws remained in force and they were in control of the Society, there was no reason for them to transfer ownership of the property away from the Society in order to protect the Society's interests. They already had control of the property. All they needed was a court to enforce that right. However, instead of making a realistic attempt to obtain court relief, defendants simply transferred ownership and announced to the world that they were the true owners, thereby placing a cloud on the Society's ownership.

25

The question here is not whether substantial evidence supports defendants' theory of the case, but whether substantial evidence supports the findings of the jury. Based on the totality of the evidence presented at trial, we conclude the jury's verdict on the slander of title claim is supported by substantial evidence.

V

*Punitive Damages Instruction*

Defendants contend the trial court erred in instructing the jury on punitive damages and, therefore, the punitive damages award must be reversed.

Civil Code section 3294 reads in relevant part: "(a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. [¶] . . . [¶] (c) As used in this section, the following definitions shall apply: [¶] (1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. [¶] (2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of the person's rights. [¶] (3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

In *College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704 (*College Hospital*), the state high court suggested use of the word "despicable" in the definition of malice "seems to represent a new substantive limitation on punitive damage awards." (*Id.* at p. 725.) According to the court, "the adjective 'despicable' is a powerful term that refers to circumstances that are 'base,' 'vile,' or 'contemptible.' (4 Oxford English Dict.

26

(2d ed. 1989) p. 529.) As amended to include this word, the statute plainly indicates that absent an intent to injure the plaintiff, 'malice' requires more than a 'willful and conscious' disregard of the plaintiffs' interests. The additional component of 'despicable conduct' must be found." (*Ibid.*)

In line with Civil Code section 3294 and *College Hospital*, the pattern jury instruction, CACI No. 3941, reads: "If you decide that [*name of defendant*]'s conduct caused [*name of plaintiff*] harm, you must decide whether that conduct justifies an award of punitive damages. At this time, you must decide whether [*name of plaintiff*] has proved by clear and convincing evidence that [*name of defendant*] engaged in that conduct with malice, oppression, or fraud. The amount of punitive damages, if any, will be decided later.

" 'Malice' means that [*name of defendant*] acted with intent to cause injury or that [*name of defendant*]'s conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another. A person acts with knowing disregard when he or she is aware of the probable dangerous consequences of his or her conduct and deliberately fails to avoid those consequences.

" 'Oppression' means that [*name of defendant*]'s conduct was despicable and subjected [*name of plaintiff*] to cruel and unjust hardship in knowing disregard of [his/her] rights.

" 'Despicable conduct' is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

" 'Fraud' means that [*name of defendant*] intentionally misrepresented or concealed a material fact and did so intending to harm [*name of plaintiff*]." (CACI No. 3941.)

The instruction given in this case was somewhat different. In the first paragraph of the instruction, the second sentence read: "At this time, you must decide whether the Sacramento Sikh Society has proved by clear and convincing evidence that defendants

*conspired to engage and/or* engaged in that conduct with malice, oppression, or fraud." (Italics added.) In addition, the instruction given by the court defined despicable as follows: "Despicable conduct is conduct that is so *mean,* vile, base or contemptible that it would be looked down upon and despised by reasonable people." (Italics added.)

Defendants argue the foregoing modifications to the standard instruction reduced the Society's burden of proof by permitting a finding of liability based solely on a conspiracy to engage in malicious conduct and based on conduct that is merely "mean." Defendants argue "[t]he law does not allow for recovery of punitive damages based on 'conspiring' to engage in wrongful conduct." Defendants further assert "[t]he word 'mean' is defined as 'selfish in a petty way; unkind.' " According to defendants, "[p]etty and unkind conduct is not synonymous with the type of despicable conduct required under the law for an award of punitive damages."

The Society contends defendants failed to object to the foregoing instruction and, therefore, have forfeited the issue for purposes of review. By stipulation, the discussion of instructions was not reported. On the record, the court asked if there was any objection to CACI No. 3941. The following colloquy ensued:

"MR. ORTIZ [defense counsel]: No. Other than --

"THE COURT: Other than on the substance.

"MR. ORTIZ: -- the objection that I had earlier."

The Society argues an objection based "on the substance" is not a specific objection to use of the word "mean" or the inclusion of conspiracy liability.

It was, of course, incumbent on defendants to place on the record their objection to the instruction in order to preserve it for appeal. Although it is clear defendants had some objection to the instruction, we are left to guess what that might have been. But even assuming defendants did not forfeit the objection in this instance, we do not agree with them on the merits.

28

On the issue of conspiracy liability, defendants provide no legal authority for their assertion that the law does not permit recovery of punitive damages based on a conspiracy to engage in prohibited conduct. A legal point that is raised but not argued in any detail or supported by citation to legal authority is forfeited. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.) In this instance, the fact that a given defendant conspired with the others to harm the Society but then left it to the others to do the dirty work and put the plan into action is hardly a reason to deny an award of punitive damages against that defendant. In this instance, the jury was instructed that a given defendant may be held liable for slander of title only if that defendant agreed with the others to prepare the false deeds and prepare and send the false letters and intended that the slander of title be committed. The jury was also instructed that it must determine if that defendant acted with malice, oppression or fraud. Nothing more is required.

As for addition of the word "mean" to the definition of "despicable," the Society contends that change did not lessen their burden of proof because the word "is also defined as 'contemptible,' 'base,' and generally 'below the normal standards of human decency and dignity.' " The Society further argues that, in any event, a finding of malice can be based on either intentional conduct or despicable conduct, and the evidence presented at trial shows defendants' conduct was intended to cause harm to the Society.

Because we agree with the Society that addition of the word "mean" in the instruction did not lessen its burden of proof in this matter, we need not consider the Society's alternate argument that any instructional error was vitiated by evidence of intentional misconduct. Even accepting defendants' definition of the word "mean," i.e., " 'selfish in a petty way; unkind,' " the remainder of the instruction required a finding of more serious misconduct. "It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538-539.) The entire definition given here read:

29

"Despicable conduct is conduct that is so mean, vile, base or contemptible that it would be looked down upon and despised by reasonable people."  In order to satisfy the instruction, conduct that is merely selfish in a petty way or unkind would also have to be the type that reasonable people would normally look down upon and despise.  Hence, while we would discourage efforts by the parties or the trial court to modify or clarify the pattern jury instructions, we find the addition of the word "mean" in this instance did not lessen the Society's burden of proof.

VI

*Sufficiency of the Evidence on Punitive Damages*

At the end of the punitive damages phase, defendants moved for a directed verdict, claiming the Society failed to present sufficient evidence of their financial condition.  In particular, defendants argued there was no evidence of their living expenses and none of the Society's document requests concerned such expenses.  The trial court disagreed, pointing out that some requests, such as those for bank records, would have covered expense evidence.  The court indicated punitive damages may be awarded against a defendant who fails to produce requested financial documents, and concluded this is such a case.  The court therefore denied the motion for directed verdict.

Defendants contend there was insufficient evidence presented at trial regarding their net worth and other financial condition to warrant an award of punitive damages.  Defendants argue a punitive damages award must bear a reasonable relationship to a given defendant's financial condition and such determination cannot be made in the absence of evidence of that condition.  Defendants argue that, in this instance, the trial court absolved the Society of the obligation to present such financial evidence because of defendants' failure to produce sufficient financial evidence in response to discovery requests.  Defendants further argue the Society relied solely on limited evidence of

30

defendants' assets and ignored evidence of their liabilities, but it is the combination of the two that the jury must consider.

On a challenge to the amount of a punitive damages award, our function is to determine if the award "is excessive as a matter of law or raises a presumption that it is the product of passion or prejudice." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109-110.) The underlying purpose of punitive damages is to punish wrongdoing and thereby protect the public from future misconduct either by the defendant or by some other potential wrongdoer. (*Id.* at p. 110.) "The essential question therefore in every case must be whether the amount of damages awarded substantially serves the societal interest." (*Ibid.*) Three factors to be considered in answering that question are: (1) the nature of the defendant's wrongdoing; (2) the amount of compensatory damages awarded; and (3) the wealth of the defendant. (*Ibid.*) In *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, the state high court observed: "[T]he function of deterrence [citation] will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." (*Id.* at p. 928.) Thus, "the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65.) "A reviewing court cannot make a fully informed determination of whether an award of punitive damages is excessive unless the record contains evidence of the defendant's financial condition." (*Adams v. Murakami*, *supra*, 54 Cal.3d at p. 110.)

Defendants contend the present record does not contain sufficient evidence to permit informed review. However, in making that argument, defendants fail to provide any summary of the evidence that was presented at trial or any explanation as to how that evidence is inadequate. A party challenging sufficiency of the evidence must summarize

31

the evidence on the point, both favorable and unfavorable. (*Roemer v. Pappas* (1988) 203 Cal.App.3d 201, 208.) Failure to do so may be considered a forfeiture. (*Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 832.) Opposing counsel is not required to set forth the evidence supporting the judgment of the trial court. Nor is it the obligation of this court to comb through the record looking for evidence supporting the judgment.

In their reply brief, under the heading, "Appellants Fairly Summarized the Evidence," defendants acknowledge that the Society argues the foregoing point. However, according to defendants, the Society "fails to identify the evidence which was purportedly omitted or unfairly characterized." Thus, defendants argue, we should disregard the argument. However, defendants again misunderstand the respective appellate burdens of the parties. It is defendants who are required to summarize the evidence. It was not the Society's burden to point out all the evidence defendants' failed to summarize.

In *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597 (*Davidov*), the court found the defendant liable for fraud and then ordered him to produce records regarding his net worth and turn them over to the plaintiff's counsel. After the defendant failed to comply, the court entered an award of punitive damages notwithstanding the absence of evidence of the defendant's financial condition. (*Id.* at p. 603.) The Court of Appeal rejected the defendant's argument that the absence of financial evidence precluded an award of punitive damages, explaining: The "defendant was ordered to produce his financial records so that the trial court could make an evaluation of whether any particular punitive damage award would have the required deterrent effect without being overly burdensome. This order was never rescinded, nor has defendant argued on appeal that it was improper. Therefore, by failing to bring in any records which would reflect his financial condition, despite being ordered to do so, and by failing to challenge that ruling on appeal, defendant has waived any right to complain of the lack of such evidence." (*Id.* at pp. 608-609.)

Defendants contend *Davidov* is inapplicable to the present matter because, in that case, no financial records were produced in response to a court order. According to defendants, in the present matter it was plaintiff who issued the notice to produce and four of the defendants in fact did produce all documents available to them.

But the fact that the document production here was pursuant to a notice from plaintiff rather than a court order, as defendants assert, is of no importance. Defense counsel agreed to produce the requested documents and the trial court ordered such production by a particular date and time. Thus, there was an order to produce, and defendants were required to comply.

As for defendants' assertion that some of them did in fact produce financial documents, that does not distinguish the present matter from *Davidov*. It is clear from the testimony of the four individuals that their production of financial documents was extremely limited. Defendants argue they repeatedly testified that they produced all documents in their possession that were requested. However, given the questionable nature of that testimony as a whole, including Tatla's shifting story about whether he was still farming and how much land he owned, Gill's claim that he does not own any property because his property is instead in a family trust, and Harinder Singh's testimony that he could not find any documentation whatsoever regarding the home he owns with his father, the court was free to discount these claims of compliance.

To the extent defendants' limited production of documents precluded plaintiff from presenting sufficient evidence of their net worth, this matter is comparable to *Davidov*. A defendant who fails to comply with a document request has forfeited any right to complain of the lack of such evidence. This applies equally to a defendant who simply fails to make an appearance at trial. And to the extent any defendant did comply with the document request, as defendants assert, defendants have failed to summarize the evidence relating to that defendant or explain how it is inadequate. Defendants have therefore forfeited their substantial evidence claim.

33

DISPOSITION

The judgment is affirmed.  The Society is awarded its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


       HULL       , J.


We concur:


     NICHOLSON    , Acting P. J.


     ROBIE      , J.