Filed 11/19/15  Kammer v. Corwin CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROBERT J. KAMMER,<br><br>    Plaintiff, Cross-defendant and Respondent,<br><br>    v.<br><br>MERLYN A. CORWIN, Individually and as Personal Representative, etc.,<br><br>    Defendant, Cross-complainant and Appellant;<br><br>MARK BAUM et al.,<br><br>    Cross-defendants and Respondents. | D067190<br><br><br>(Super. Ct. No. 37-2014-0001790-CU-BC-CTL) |

APPEAL from orders of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Reversed and remanded.

Hosie Rice, Spencer Hosie, Anthony K. Lee and Darrell R. Atkinson for Defendant, Cross-complainant and Appellant.

Law Offices of James E. McElroy and James E. McElroy for Cross-defendants and Respondents Mark Baum and Imprimis Pharmaceuticals, Inc.

Witham Mahoney & Abbott and Matthew M. Mahoney for Plaintiff, Cross-defendant and Respondent Robert J. Kammer.

Merlyn A. Corwin (Merlyn), individually and as representative of her husband Michael P. Corwin's (Michael) estate (Estate), filed a cross-complaint against Robert J. Kammer, Sandy Greenberg, Mark Baum, and Imprimis Pharmaceuticals, Inc. (Imprimis) to rescind the settlement agreement between Kammer and Merlyn. Michael had died with unpaid debts to Kammer. Under the settlement agreement, Merlyn agreed to transfer a substantial amount of her Imprimis stock to Kammer and to limit the sales of her remaining Imprimis stock, in satisfaction of the outstanding debt owed to Kammer and his release of claims against her and the Estate. Kammer was the chairman of Imprimis's board of directors.

The basis of Merlyn's cross-complaint was that Kammer and other Imprimis insiders engaged in a number of wrongful actions constituting securities fraud, undue influence and duress, to acquire a substantial portion of her Imprimis stock and restrict her from freely selling other Imprimis stock she owned; after she signed the settlement agreement, the stock price significantly increased. Cross-defendants Kammer, Baum, and Imprimis filed motions to strike the operative cross-complaint pursuant to Code of

2

Civil Procedure[1] section 425.16, commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute, which the trial court granted. Merlyn appeals, contending the misconduct of cross-defendants alleged in the cross-complaint was not protected activity under section 425.16. We agree and reverse the orders granting the anti-SLAPP motions.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Events Leading to the Operative Cross-complaint in This Case*

1. Relevant Debts, Ownership of Imprimis Stock Shares, and Michael's Death

Beginning in 2010, Michael (or a company he controlled) borrowed money evidenced by three notes (Notes), each for $100,000. The Notes were either initially or eventually held by Kammer, a close personal friend of Michael. Under the 2010 "Javelin Note," due in December 2012, Kammer loaned money to Michael's company, Javelin Innovations, Inc. Michael personally guaranteed the Javelin Note, due in November 2014.

Under the 2011 "DermaStar Note," due on October 31, 2013, Kammer loaned money to Michael to acquire a 10 percent ownership interest in DermaStar International, LLC (DermaStar), a new company cofounded by Kammer. Michael's ownership interest in DermaStar served as collateral for the DermaStar Note. The DermaStar Note's collateral could not be transferred, encumbered, or otherwise impaired until that Note was

---

1    All further statutory references are to the Code of Civil Procedure unless otherwise specified.

3

paid in full. Subsequently, DermaStar dissolved and, pursuant to a dissolution agreement, Michael's ownership interest in DermaStar was converted into approximately 295,000 shares of Imprimis stock. Imprimis is a publicly-traded pharmaceutical company.

Finally, under the May 2013 "Honig Note," due on November 13, 2013, an investor, Barry Honig, loaned money to Michael, who pledged all of his Imprimis stock as collateral. Before the Honig Note matured, Kammer purchased it from Honig.

In May 2013, Michael was diagnosed with a life-threatening cancer, and he died on October 29, 2013, despite undergoing a bone marrow transplant and grueling medical treatment. Merlyn spent the last month of Michael's life in the hospital with him, and she was devastated by his death. They had been married for 24 years and had two children together, one of whom was still a minor. When Michael died, the Imprimis stock was one of Merlyn's few liquid assets she could use to support her and her family.

2. Kammer and Other Cross-defendants' Activities

As pleaded in the operative cross-complaint, beginning in June 2013, Kammer began working with Baum, Imprimis's Chief Executive Officer (CEO), and Greenberg, a stock broker and consultant, to prevent the Corwins from freely selling their Imprimis stock. Kammer, Baum, and Greenberg's ostensible purpose was to keep Imprimis's stock price up by limiting the amount of shares for sale in the open market. Kammer separately urged both Michael and Merlyn to sell a block of Imprimis shares to someone of Kammer's choosing and presumably under his control, but neither agreed.

4

According to cross-defendants, Imprimis was a "thinly traded" public company, which meant the daily trading volume was low. Baum had routinely used legal agreements ("lock up and leak out") to regulate the amount of stock for sale to protect the company's value and shareholders; a large shareholder's aggressive sales of stock could destabilize Imprimis and reduce its stock value. One of Baum's duties, as CEO of a for-profit corporation, was to maintain and build the company's value. After Michael's death, Kammer and Baum were concerned that Merlyn would "dump[] large portions of her stock" on the market to pay Michael's debts, and she held a large enough share position to cause Imprimis's share price to drop "precipitously." Kammer and Baum also believed that Michael had violated agreements to lock-up his Imprimis stock, including pledging shares to Honig and his cousin Andrew. Consequently, in the days after Michael's death, there was a flurry of communications between Kammer, Baum, Greenberg, and others, regarding how to control the sale of Merlyn's Imprimis stock.

By November 5, 2013, Kammer had contacted Chris Ludmer, a lawyer and partner of the firm Kaplan Ludmer, LLP. Kammer knew Ludmer through Ludmer's previous representation of DermaStar (predecessor-in-interest to Imprimis) in litigation. Kammer was owed money by Michael and he believed Michael had committed fraud by pledging his Imprimis stock to others. In this regard, Ludmer contemplated litigation against Merlyn and/or the Estate on behalf of Kammer.

Notwithstanding that the Estate owed money to him, on November 6, 2013, Kammer acquired additional debt owed by the Estate—the Honig Note—for the declared purpose of securing his collateral in the DermaStar Note. On the same day, Ludmer filed

5

a UCC financing statement (UCC Lien) to perfect Kammer's security interest in the Corwins' shares of Imprimis stock. Ludmer contacted the Imprimis stock transfer agent and placed a "stop transfer" order on the Corwins' Imprimis stock. Ludmer also notified the stockbroker holding Corwins' shares: "[Y]ou may not sell or transfer any shares in Imprimis held by the Estate of Michael Corwin, or by his wife, Merlyn Corwin. Dr. Kammer has a perfected security interest in the shares previously owned by Michael Corwin (now deceased)." As alleged, these actions were part of cross-defendants' plot to restrict Merlyn's sales of Imprimis stock and to acquire her stock at below-market prices.

3. Kammer and Merlyn's Negotiations and Settlement

On November 7, 2013, Ludmer called Colin Kelley, probate attorney for Merlyn and the Estate. Ludmer asserted claims on behalf of Kammer, threatened litigation, and began discussing settlement. Also that day, Ludmer emailed Kelley a settlement demand letter with terms that would require Merlyn to pay Kammer approximately $382,000 in cash and agree to restrict her Imprimis stock sales to 10,000 shares per month, in satisfaction of all the Notes and a general release of claims. As part of his client's settlement demand, Ludmer wrote that if the parties did not reach an acceptable settlement, Kammer would have "no choice but to collect on the [Imprimis] collateral" and pursue other claims against the Estate. Over the next week, Ludmer and Kelley exchanged and discussed settlement offers and terms.

On November 15, 2013, Ludmer made what would become the final settlement offer on behalf of Kammer, including the statement that Kammer "will foreclose on the notes and liquidate as much [Imprimis] stock as is required (at a much discounted price

6

as an affiliate)" if the offer was not accepted soon. The principal terms of the offer were: (1) Merlyn would transfer 100,000 Imprimis shares to Kammer, (2) sell 75,000 more shares to a designated buyer at $3.00 per share, and (3) sell her remaining shares at a rate of no more than 10,000 per month. The threat of foreclosure was repeated in another communication; a few days later, Merlyn agreed to Kammer's terms, which were then set forth in a written settlement agreement (Settlement Agreement). In November 2013, Imprimis stock was publicly trading in the range of $4.00 per share.

### 4. Postsettlement Agreement

Under the Settlement Agreement's terms, Merlyn was required to transfer 100,000 shares of Imprimis stock to Kammer immediately after she obtained ownership from the Estate. Beginning in early December 2013, Imprimis's stock price began rising as a result of the company's announcements regarding investment strategy, drug development portfolio, and prospective revenues—information that cross-defendants were alleged to possess before Merlyn signed the Settlement Agreement. By early January 2014, Merlyn had acquired ownership of the 295,000 Imprimis shares through probate, but did not sign transfer instructions. In late January 2014, the stock was publicly trading at around $8.00 per share.

### B. *The Operative Cross-complaint and Cross-defendants' Anti-SLAPP Motions*

In February 2014, Kammer initiated a court action against Merlyn for specific performance and breach of the Settlement Agreement, among other claims. Merlyn filed a cross-complaint against Kammer and then a first amended cross-complaint to add Imprimis as a cross-defendant. Kammer demurred to the first amended cross-complaint

7

on the primary ground that the litigation privilege, Civil Code section 47, subdivision (b), barred Merlyn's claims. The court (Judge Meyer) overruled the demurrer, stating that most of the allegedly wrongful statements were not subject to the litigation privilege because they referred to "foreclosing" on the Notes, and there were factual disputes regarding the threats of litigation.

In August 2014, Merlyn filed the operative second amended cross-complaint (SACC), adding Baum and Greenberg as cross-defendants. The SACC asserts the following groups of claims: (1) securities fraud under Corporations Code sections 25400 et seq. and 25500 et seq.; (2) fraud by concealment and misrepresentations; (3) rescission and declaratory relief of rescission, based on fraudulent misrepresentations, concealment, undue influence, economic duress, duress/menace, and incapacity; and (4) intentional infliction of emotional distress. Subsequently, the case was reassigned to Judge Sturgeon.

Kammer, Imprimis and Baum filed anti-SLAPP motions to strike the SACC, which motions were granted by the court. Greenberg did not file an anti-SLAPP motion. Merlyn appeals the orders granting cross-defendants' motions to strike.

DISCUSSION

A. *The Anti-SLAPP Statute*

A SLAPP suit—a strategic lawsuit against public participation—seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109, fn. 1.) The Legislature enacted section 425.16 to provide a

procedural remedy to more quickly dispose of lawsuits brought to chill the valid exercise of constitutional rights. (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 865.)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) This court considers " 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' " (*Ibid.*, citing § 425.16, subd. (b)(2).) The court does not weigh or compare the evidence, but rather accepts as true the evidence favorable to the plaintiff while evaluating the defendant's evidence " 'only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " (*Soukup,* at p. 269, fn. 3.) The appellate court employs the same procedure as the trial court in determining how the motion should have been decided. (*Mendoza v. ADP Screening & Selection Services*, *Inc.* (2010) 182 Cal.App.4th 1644, 1651-1652.)

A court's consideration of an anti-SLAPP motion involves a two-pronged analysis. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477.) " 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity.' " (*Ibid.*, citing § 425.16, subd. (b)(1).) The "*principal thrust* or *gravamen*" of the claim is what governs, not individual factual allegations. (*Martinez v. Metabolife Internat.*, *Inc.* (2003) 113 Cal.App.4th 181, 188.)

A challenged cause of action arises from activity protected by the statute when " ' "the act underlying the plaintiff's cause" or "the act which forms the basis for the plaintiff's cause of action" ' " was an act in furtherance of the defendant's right of petition

9

or free speech.  (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928-929.)  " 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e).' "  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

Subdivision (e) of section 425.16 defines an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' [as]:  (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, [or] (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law[.]"  (§ 425.16, subd. (e); *Briggs v. Eden Council for Hope & Opportunity*, *supra*, 19 Cal.4th at p. 1113.)

If the defendant demonstrates that a cause of action falls within the anti-SLAPP statute's protection, the burden then shifts to the plaintiff to prove that he or she has a probability of prevailing on the merits.  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)  The plaintiff must " 'state[] and substantiate[] a legally sufficient claim.' "  (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 741.)  This requires the plaintiff to " ' "demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' "  (*Ibid.*)

B. *The SACC's Causes of Action Did Not Arise from Cross-defendants' Free Speech or Petitioning Activities*

Our threshold task is to determine whether the basis for the causes of action asserted in the SACC was an act or conduct in furtherance of cross-defendants' rights of petition or free speech. (§ 425.16, subd. (e).) Merlyn contends that the gravamen of her claims arose from business activities not protected under the anti-SLAPP statute, and Ludmer's actions did not relate to any seriously contemplated litigation. Cross-defendants respond that all of the acts are protected under the anti-SLAPP statute based on application of the litigation privilege. They argue the claims in the SACC arose from statements made by Ludmer, an attorney, during settlement negotiations, or actions taken by Ludmer to achieve the objects of litigation. We analyze Baum and Imprimis's anti-SLAPP motion separately from Kammer.

1. Baum and Imprimis

Merlyn's claims did not "arise from" Baum's or Imprimis's right of petition or free speech. (§ 425.16, subd. (b)(1) [providing a motion to strike for "[a] cause of action *against* a person arising from any *act of that person* in furtherance of *the person's right* of petition or free speech," italics added].) Even if we start from the premise that Ludmer engaged in settlement negotiations with attorney Kelley, Ludmer did not assert any claims by Baum or Imprimis against Merlyn or the Estate. It is undisputed that any obligations owed by the Estate under the Notes were to Kammer, personally. There is nothing in the record to support that Ludmer had any intention of initiating a lawsuit on Baum's or Imprimis's behalf, and Baum's stated interest in the matter was limited to

11

maintaining Imprimis's stock price.  Baum and Imprimis have not met their burden of showing the causes of action asserted against them in the SACC arose from any acts in furtherance of their rights of petition or free speech, and their anti-SLAPP motions should have been denied.

2.  Kammer

We next consider whether the acts by Kammer underlying Merlyn's claims were done in furtherance of his right of petition or free speech.  At the outset, we note that statements covered by the litigation privilege are not necessarily also protected under the anti-SLAPP statute.  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 324-325 [attorney's extortion letter offering settlement of proposed litigation was not entitled to anti-SLAPP protection even though it might have been subject to litigation privilege].)  "[T]he litigation privilege and the anti-SLAPP statute are substantively different statutes that serve different purposes."  (*Garretson v. Post* (2007) 156 Cal.App.4th 1508, 1519 [purpose of litigation privilege is to guarantee access to courts and purpose of anti-SLAPP statute is to protect the valid exercise of free speech and petition rights].)  Nevertheless, courts have used the litigation privilege as an aid in construing the scope of section 425.16, subdivision (e), which may be appropriate when the purposes underlying both statutes are achieved.  (*Flatley, supra,* 39 Cal.4th at pp. 322-323; *A.F. Brown Electrical Contractor, Inc. v. Rhino Electric Supply, Inc.* (2006) 137 Cal.App.4th 1118, 1126.)

Here, the thrust of each of Merlyn's claims is that cross-defendants schemed to control sales of her Imprimis stock and maintain or elevate stock prices.  They allegedly

took improper actions to cloud title and restrict transfer of Merlyn's Imprimis stock, such as filing the UCC Lien and placing a "stop transfer" order. Cross-defendants also allegedly possessed, yet failed to disclose, material inside information that would significantly impact market prices. As alleged in the SACC, these events occurred when Merlyn was particularly vulnerable and exhausted from grief, causing her to agree to transfer her stock at below-market prices. Based on our review of the pleadings and other relevant documents, these activities related to private business transactions and did not implicate protected activity under the anti-SLAPP statute. (*Blackburn v. Brady* (2004) 116 Cal.App.4th 670, 677 [fraud committed in "a purely business type event or transaction" is not the type of protected activity contemplated under § 425.16, subd. (e)].)

Importantly, there was no need for Kammer to acquire additional debt owed by the Estate in preparation for litigation on the existing debt owed by the Estate. Ludmer's filing of a UCC Lien and issuing a "stop transfer" order of Merlyn's stock were done to prevent the sales of Imprimis stock in the open market rather than to achieve any litigation objective. (See *Garretson v. Post*, *supra*, 156 Cal.App.4th at p. 1522 [nonjudicial foreclosure proceedings, including giving notice of nonjudicial foreclosure, were not protected conduct]; *A.F. Brown Electrical Contractor, Inc. v. Rhino Electric Supply, Inc., supra,* 137 Cal.App.4th at p. 1128 [belief in legally viable claim and threat to "pursue all available legal remedies" were insufficient to demonstrate that a lawsuit was under serious consideration].) At the time Ludmer undertook these actions, no litigation had been threatened.

13

Kammer has not established that the allegedly wrongful statements made by Ludmer during settlement discussions—threats to imminently liquidate Merlyn's Imprimis stock and the "thin" market for such stock—were "made in connection with an issue under consideration or review by a . . . judicial body . . . ." (§ 425.16, subd. (e).) In typical cases in which courts have extended anti-SLAPP protection to settlement communications, the scope of issues under judicial review was evident because litigation was pending. (See, e.g., *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 963 [summarizing *anti–SLAPP cases in the settlement negotiation context*]*; GeneThera, Inc. v. Troy & Gould Professional Corp.* (2009) 171 Cal.App.4th 901, 908 ["Both causes of action in appellants' complaint are based on TG's communication of an offer *to settle the ongoing lawsuit*, a matter connected with issues under consideration or review by a judicial body."], italics added, fn. omitted.) At the time Ludmer's statements were made, there was no pending lawsuit, and the challenged statements appear directed toward a private transaction or restriction on sales of Merlyn's Imprimis stock rather than issues to be considered by a judicial body.[2] (See *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 36 (1997) [litigation privilege does not attach until litigation is imminent and seriously contemplated, not merely threatened as a negotiating tactic].) Kammer has

---

[2] Baum expressly directed Kammer and Ludmer to obtain a "lock up and leak out" agreement from Merlyn, and Ludmer was "on retainer" as Imprimis's outside counsel. As we have indicated, negotiating a business agreement with the mere threat of litigation lurking in the background does not implicate protected activity under the anti-SLAPP statute.

not established that the litigation privilege applies, and we are not persuaded Merlyn's claims implicated protected activity under the anti-SLAPP statute.

Kammer has not met his burden of showing that the causes of action pleaded in the SACC arose from protected conduct. Accordingly, the burden of showing a probability of prevailing on her claims never shifted to Merlyn, and we have no need to discuss the second prong of section 425.16.

## DISPOSITION

The orders granting cross-defendants' anti-SLAPP motions are reversed, and the case is remanded to the trial court with directions to vacate the orders and enter a new order denying the motions. Appellant shall recover her costs on appeal.

McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

AARON, J.

15